# 15-2684(L)

## 17-2669(CON)

*To Be Argued By*:
SETH D. DUCHARME

# United States Court of Appeals

## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

AGRON HASBAJRAMI,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF AND ADDENDUM
## FOR THE UNITED STATES

RICHARD P. DONOGHUE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

DAVID C. JAMES,
SETH D. DUCHARME,
SARITHA KOMATIREDDY,
    *Assistant United States Attorneys,*

JOSEPH F. PALMER,
    *Attorney, National Security Division,*
    *United States Department of Justice,*
    *(Of Counsel).*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...............................................v

PRELIMINARY STATEMENT..............................................1

STATEMENT OF FACTS.................................................4

    I.    Background.................................................4

        A.    The Investigation of International
            Terrorism..........................................4

            1.    Agron Hasbajrami.............................4

            2.    Individual #1................................4

            3.    The Investigation of Hasbajrami..............5

            4.    Hasbajrami's Offense Conduct.................6

                a.    Hasbajrami's Contact with
                    Individual #1........................6

                b.    Hasbajrami's Attempts to Travel
                    Overseas to Support Terrorism.........7

                c.    Hasbajrami's Arrest..................8

        B.    The Criminal Case Against Hasbajrami.............9

            1.    Charges......................................9

            2.    FISA Notice.................................10

            3.    Request for CIPA Conference.................10

            4.    First Guilty Plea and Sentencing...........11

            5.    Supplemental FAA Notice.....................11

        C.    FISA Litigation in the District Court...........13

            1.    CIPA Litigation.............................13

            2.    Hasbajrami's Challenge to the FAA..........14

D.  Hasbajrami's Second Guilty Plea,
Sentencing, and Appeal..........................16

E.  Ongoing District Court Proceedings and
Hasbajrami's Second Appeal......................17

1.  The District Court's Opinion
Explaining its Denial of Hasbajrami's
Claims Regarding the FAA...................17

2.  The District Court's Rejection of
Hasbajrami's Requests for Access to
the Classified Information Contained
in Judge Gleeson's Initial Opinion........22

SUMMARY OF ARGUMENT.........................................25

POINT ONE - THE SECTION 702 SURVEILLANCE DID NOT
VIOLATE THE FOURTH AMENDMENT.......................29

I.  The Legal Framework for Foreign Intelligence
Collection.............................................29

A.  The Foreign Intelligence Surveillance
Act.............................................29

B.  The FISA Amendments Act........................32

C.  Submission to the FISC for Approval............35

D.  The FISC's Order...............................37

E.  Implementing Section 702 Authority.............38

F.  Oversight......................................39

II.  The Surveillance in this Case Was Lawful
Under the Fourth Amendment............................40

A.  The Fourth Amendment Does Not Require
the Government to Obtain a Warrant
before Conducting Surveillance under
Section 702....................................42

1.  A Warrant Is Not Required To Conduct
Foreign-Intelligence Surveillance
Targeting Non-U.S. Persons Located
Abroad....................................43

a.    The Fourth Amendment Generally
      Does Not Apply to Non-U.S.
      Persons Abroad.........................43

b.    The Incidental Collection of
      Communications of U.S. Persons
      Pursuant to Intelligence
      Collection Lawfully Targeting
      Non-U.S. Persons Located Outside
      the United States Does Not
      Trigger a Warrant Requirement.........46

2.    Section 702 Surveillance Falls within
      the Foreign Intelligence Exception to
      the Warrant Requirement....................52

      a.    The "Special Needs" Doctrine..........53

      b.    The Foreign Intelligence
            Exception.............................56

      c.    The Government's Purpose in
            Conducting Surveillance Under
            Section 702 Goes Beyond Ordinary
            Crime Control.........................59

      d.    A Warrant or Probable Cause
            Requirement to Collect Foreign
            Intelligence Information Would
            be Impracticable......................60

B.  Section 702 Is Constitutional Under the
    Fourth Amendment's Reasonableness Test..........63

    1.    Collection Under Section 702 Advances
          the Government's Compelling Interest
          in Obtaining Foreign Intelligence
          Information to Protect National
          Security.....................................68

    2.    Persons in the United States Have a
          Lesser Expectation of Privacy in
          their Communications with Non-U.S.
          Persons Located Outside of the United
          States.......................................70

3.  The Privacy Interests of U.S. Persons
    Are Protected by Stringent Safeguards
    and Procedures.............................72

4.  Collection Under 702 Has Sufficient
    Particularity..............................81

C.  The Good Faith Exception to the
    Exclusionary Rule Applies in this Case..........83

POINT TWO - THE GOVERNMENT COMPLIED WITH THE
            STATUTORY REQUIREMENTS IN THIS CASE................85

I.  The Section 702 Collection in this Case
    Targeted a Foreign Person in a Foreign
    Country for a Foreign Intelligence Purpose...........85

II. Ex Parte Review of Foreign Intelligence
    Surveillance Is Appropriate..........................88

POINT THREE - THE REDACTIONS IN THE DISTRICT COURT'S
              OPINION DID NOT VIOLATE  HASBAJRAMI'S
              DUE PROCESS RIGHTS...............................93

I.  The District Court Made Minor Modifications
    to Its Initial Opinion..............................93

II. Chief Judge Irizarry Reviewed the
    Redacted Information................................94

CONCLUSION................................................97

TABLE OF AUTHORITIES

Page

CASES

Ball v. Woods,
  402 F. Supp. 803 (N.D. Ala. 1975) ........................... 92

[Caption Redacted],
  2011 WL 10945618 (FISC Oct. 3, 2011) .................... passim

[Caption Redacted],
  2011 WL 10947772 (FISC Nov. 30, 2011) ....................... 78

[Caption Redacted],
  Mem. Op. (FISC Aug. 26, 2014) ............................... 74

[Caption Redacted],
  Mem. Op. (FISC Nov. 6, 2015) ................................ 80

[Caption Redacted],
  Mem. Op. (FISC Apr. 26, 2017) ............................ 74-75

Cassidy v. Chertoff,
  471 F.3d 67 (2d Cir. 2006) .............................. 55, 68

City of Indianapolis v. Edmond,
  531 U.S. 32 (2000) .......................................... 54

Clapper v. Amnesty Int'l USA,
  133 S. Ct. 1138 (2013) ............................. 34, 40, 73

Davis v. United States,
  564 U.S. 229 (2011) ......................................... 83

Griffin v. Wisconsin,
  483 U.S. 868 (1987) ......................................... 54

Herring v. United States,
  555 U.S. 135 (2009) ......................................... 83

Illinois v. Krull,
  480 U.S. 340 (1987) ......................................... 83

Illinois v. McArthur,
  531 U.S. 326 (2001) ......................................... 65

In re Directives Pursuant to Section 105B of the Foreign
  Intelligence Surveillance Act,
  551 F.3d 1004 (FISA Ct. Rev. 2008) ....................... passim

In re Sealed Case,
  310 F.3d 717 (FISA Ct. Rev. 2002) ....................... passim

In re Terrorist Bombings of U.S. Embassies,
  552 F.3d 157 (2d Cir. 2008) ............................. passim

MacWade v. Kelly,
  460 F.3d 260 (2d Cir. 2006) ................................. 55

Maryland v. King,
  569 U.S. 435 (2013) ........................... 53, 54, 64, 82

Mistretta v. United States,
  488 U.S. 361 (1989) ........................................ 84

Nat'l Treas. Employees Union v. Von Raab,
  489 U.S. 656 (1989) ........................................ 40

New Jersey v. T.L.O.,
  469 U.S. 325 (1985) ..................................... 40-41

Pennsylvania v. Mimms,
  434 U.S. 106 (1977) ........................................ 41

Samson v. California,
  547 U.S. 843 (2006) .................................... 54, 64

Skinner v. Ry. Labor Execs.' Ass'n,
  489 U.S. 602 (1989) ........................................ 62

Terry v. Ohio,
  392 U.S. 1 (1968) .......................................... 41

United States v. Abu-Jihaad,
  630 F.3d 102 (2d Cir. 2010) ..................... 63, 88, 90

United States v. Bin Laden,
  126 F. Supp. 2d 264 (S.D.N.Y. 2000) .............. 48, 52, 63

United States v. Brown,
  484 F.2d 418 (5th Cir. 1973) ............................... 56

United States v. Buck,
  548 F.2d 871 (9th Cir. 1977) ............................... 56

United States v. Butenko,
  494 F.2d 593 (3d Cir. 1974) ............................. 47, 56

United States v. Daoud,
  755 F.3d 479 (7th Cir.),
  supplemented, 761 F.3d 678 (7th Cir. 2014) ......... 88, 90, 95

United States v. Dhafir,
  461 F.3d 211 (2d Cir. 2006) ................................. 25

United States v. Duggan,
  743 F.2d 59 (2d Cir. 1984) .................................. 28

United States v. Duka,
  671 F.3d 329 (3d Cir. 2011) ................................. 56

United States v. El-Mezain,
  664 F.3d 467 (5th Cir. 2011) ............................... 28

United States v. Figueroa,
  757 F.2d 466 (2d Cir. 1985) ............................ 47, 49

United States v. Flores-Montano,
  541 U.S. 149 (2004) ........................................ 53

United States v. Khan,
  415 U.S. 143 (1974) .................................... 47, 49

United States v. Knights,
  534 U.S. 112 (2001) .................................... 53, 70

United States v. Leon,
  468 U.S. 897 (1984) ........................................ 83

United States v. McKinnon,
  721 F.2d 19 (1st Cir. 1983) ............................ 49, 74

United States v. Mohamud,
  843 F.3d 420 (9th Cir. 2016), cert. denied,
  2018 WL 311442 (U.S. Jan. 8, 2018)..................... passim

United States v. Mohamud,
  Cr. No. 3:10-CR-00475-KI-1, 2014 WL 2866749
  (D. Or. June 24, 2014) ................................. 84, 95

United States v. Moussaoui,
  382 F.3d 453 (4th Cir. 2004) ............................... 92

United States v. Selioutsky,
  409 F.3d 114 (2d Cir. 2005) ................................... 27

United States v. Stewart,
  590 F.3d 93 (2d Cir. 2009) ............................... 88, 89

United States v. Tortorello,
  480 F.2d 764 (2d Cir. 1973) ................................... 47

United States v. Truong Dinh Hung,
  629 F.2d 908 (4th Cir. 1980) ................... 56, 58, 60, 61

United States v. U.S. Dist. Court for E. Dist. of Mich., S.
  Div.,
  407 U.S. 297 (1972) .......................................... 57

United States v. Verdugo-Urquidez,
  494 U.S. 259 (1990) ............................... 43, 44, 62

United States v. White,
  401 U.S. 745 (1971) .......................................... 47

Vernonia Sch. Dist. 47J v. Acton,
  515 U.S. 646 (1995) .......................................... 53

Zadvydas v. Davis,
  533 U.S. 678 (2001) .......................................... 44

Zweibon v. Mitchell,
  516 F.2d 594 (D.C. Cir. 1975) ................................ 57

## STATUTES

50 U.S.C. § 401.............................................. 31

50 U.S.C. § 1801(e).......................................... 37

50 U.S.C. § 1801(f)....................................... 31, 33

50 U.S.C. § 1801(h)............................... 30, 36, 37, 76

50 U.S.C. § 1801(i).......................................... 31

50 U.S.C. § 1803(a).......................................... 30

50 U.S.C. § 1805............................................. 30

50 U.S.C. § 1805(a).......................................... 30

50 U.S.C. § 1806(f)................................... 28, 88, 93

50 U.S.C. § 1861........................................... 95

50 U.S.C. § 1881a....................................... passim

50 U.S.C. § 1881a(1)....................................... 78

50 U.S.C. § 1881a(a)........................... 36, 45, 59, 72

50 U.S.C. § 1881a(b)................... 34, 35, 46, 67, 80

50 U.S.C. § 1881a(d).............................. 36, 73, 75

50 U.S.C. § 1881a(g).................................. 59, 72

50 U.S.C. § 1881a(h)....................................... 38

50 U.S.C. § 1881a(i)............................... 37, 67, 76

50 U.S.C. § 1881a(l)....................................... 40

50 U.S.C. § 1881e(a)....................................... 89

50 U.S.C. § 1881f(a)....................................... 40

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. IV...................................... 40

## RULES

FISC Rule of Procedure 13(b).................................. 78

## LEGISLATIVE MATERIALS

154 Cong. Rec. S6097, S6122 (June 25, 2008).................. 63

Foreign Intelligence Surveillance Act:
  Hearing before the Subcomm. On Crim. Laws
  and Procedures of the S. Judiciary Comm.,
  94th Cong., 2d Sess. (Mar. 29, 1976 et seq.) ............. 32

Modernization of the Foreign Intelligence
   Surveillance Act:  Hearing before the
   S. Select Comm. On Intelligence,
   110th Cong., 1st Sess. (2007)........................... 32-33

S. Rep. No. 95-604 (1977)................................... 30

S. Rep. No. 95-701 (1978)............................... 31, 32

Warrantless Surveillance and The Foreign
   Intelligence Surveillance Act: The Role
   of Checks and Balances in Protecting
   Americans' Privacy Rights
   Hearing Before the H. Judiciary Comm.,
   110th Congress, 1st Sess. (2007)......................... 52

## OTHER AUTHORITIES

Executive Order No. 12,333 § 2.2, 3 C.F.R. 210
   (1981 Comp.), reprinted as amended in
   50 U.S.C. § 401 note (Supp. II 2008) .................... 31

In re DNI/AG Certification,
   No. 702(i)-08-01, Mem. Op........................ 39, 73, 77

National Security Agency,
   The National Security Agency: Missions,
   Authorities, Oversight and Partnerships
   (August 9, 2013)  ....................................... 69

PCLOB, Report on the Surveillance Program Operated
   Pursuant to Section 702 of the Foreign
   Intelligence Surveillance Act (July 2, 2014) ......... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 15-2684(L), 17-2669(CON)

UNITED STATES OF AMERICA,

Appellee,

-against-

AGRON HASBAJRAMI,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Agron Hasbajrami appeals from an amended judgment entered on November 3, 2015 in the United States District Court for the Eastern District of New York (Gleeson, J.) convicting him, after a conditional guilty plea, of one count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A and one count of conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 371, and sentencing him to 192 months' imprisonment and a $200 special assessment. Hasbajrami also

appeals from orders of the same court (Irizarry, Ch.J.), entered on April 6, 2017 and August 22, 2017, denying his motion for access to Judge Gleeson's unredacted opinion and for reconsideration, respectively.

Under the terms of his plea agreement, Hasbajrami preserved the right to appeal the district court's February 20, 2015 denial of his motion to suppress evidence that was obtained or derived from surveillance conducted pursuant to Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1881a et seq. Hasbajrami argues: (1) the government's incidental interception of his electronic communications violated his Fourth Amendment rights; (2) the government violated the requirements of Section 702 through its interception of his electronic communications; and (3) Hasbajrami's Due Process rights may be violated if this appeal is adjudicated without his being granted access to a small amount of information that was redacted from the district court's memorandum and order. The American Civil Liberties Union and the Electronic Frontier Foundation, as amici curiae, also have filed a brief in support of Hasbajrami's position.

As we show below, Hasbajrami's arguments, as well as those of the amici, are without merit. Under Section 702, Congress and the Executive Branch, with ongoing review and approval by the

Foreign Intelligence Surveillance Court ("FISC"), have developed a balanced framework of procedures to govern foreign intelligence collection targeting foreign persons outside the United States while protecting the privacy interests of U.S. persons. Consistent with the statutory standards and FISC-approved procedures, the government in this case lawfully collected communications from specific email addresses by targeting, for foreign intelligence purposes, the individual users of those addresses who were non-U.S. persons located outside the United States. (A 90-91).[1] The district court correctly held that no judicial warrant was required for such collection and that the collection here was specific, targeted, and constitutionally reasonable. (A 83-91). The Ninth Circuit likewise unanimously upheld the lawfulness of Section 702 collection in similar circumstances. See United States v. Mohamud, 843 F.3d 420, 436-44 (9th Cir. 2016), cert. denied, 2018 WL 311442 (U.S. Jan. 8, 2018). This Court should reach the same conclusion.

---

[1] Citations to "A" refer to Hasbajrami's appendix. "HBr." and "ABr." refer to Hasbajrami's brief and the amici curiae brief, respectively. "PSR" and "DE" refer to the presentence report and to entries on the district court's docket, respectively. The PSR is being filed separately under seal.

STATEMENT OF FACTS

I.   Background

   A.   The Investigation of International Terrorism

      1.   Agron Hasbajrami

      In the spring of 2011, at the commencement of the government's underlying investigation into Hasbajrami's involvement in international terrorism and for several years before that, Hasbajrami was a legal permanent resident of the United States, residing in Brooklyn, New York.  (PSR ¶ 21).  As discussed further below, in 2010 and 2011, Hasbajrami communicated via email with a foreign person (referred to here as "Individual #1") who was located in a foreign country regarding matters relating to international terrorism, including purported attacks on Americans and other westerners.  (PSR ¶ 2; DE 148).

      2.   Individual #1

      During the relevant time frame, Individual #1, whose identity is known to Hasbajrami, was a foreign person residing in the Middle East, who represented himself to be a member of a jihadist fighting group.  (PSR ¶ 2; DE 148).  While questions remain as to the actual nature of Individual #1's specific conduct overseas, and whether he may have exaggerated or fabricated certain of his actions in order to solicit funds, Individual #1's stated purpose for raising money and recruiting personnel was

unequivocally to support jihadist fighting operations in the North Waziristan region of Pakistan. (PSR ¶ 3; DE 148). Individual #1 claimed that he was associated with the Pakistani Taliban. (DE 148).

### 3. The Investigation of Hasbajrami

In late April 2011, and over the course of the following summer, the Federal Bureau of Investigation's ("FBI") New York Joint Terrorism Task Force and the United States Attorney's Office for the Eastern District of New York began investigating Hasbajrami for violations of federal law, including provision of material support to terrorists. Between the time the government opened its criminal investigation in April and Hasbajrami's arrest on September 6, 2011, the government employed a number of investigative tools, including Rule 41 search warrants, grand jury subpoenas, a confidential human source and surveillance pursuant to an order of the FISC. Accordingly, some of the evidence collected by the government in the course of its criminal investigation was obtained pursuant to FISA, 50 U.S.C. §§ 1801 et seq.

The fruits of the government's investigation included, inter alia, historical emails and wire transfer records that spanned the months leading up to the initiation of the government's investigation. As was ultimately disclosed to Hasbajrami, certain

of this evidence was derived from surveillance conducted under Section 702 of FISA, which Congress added to FISA when it enacted the FISA Amendments Act of 2008, 50 U.S.C. §§ 1881 et seq. (the "FAA").

### 4. Hasbajrami's Offense Conduct

#### a. Hasbajrami's Contact with Individual #1

Beginning in 2010, and continuing through 2011, Hasbajrami sent multiple monetary wire transfers overseas to Individual #1 with the intent that the funds be used to support the activities of a jihadist fighting group in the Federally Administered Tribal Areas of Pakistan (the "FATA"). (PSR ¶ 2). In a series of email communications, Individual #1 represented to Hasbajrami that he was fighting against Americans and other westerners in Afghanistan and that he had facilitated the travel of numerous individuals to participate in jihad. (DE 148). From December 2010 through April 2011, Hasbajrami sent over $1,000 to Individual #1 to support terrorist activity. (Id.).

In addition, Hasbajrami informed Individual #1 via email that he wanted to travel overseas and "marry the virgins," jihadist terminology that refers to the anticipated reward for dying as a martyr while fighting in a just holy war. On April 7, 2011, Hasbajrami requested, via email, that Individual #1 provide him with directions to the location of a jihadist group in the

FATA. Individual #1 agreed, and sent Hasbajrami plausible, detailed instructions on how to reach the North Waziristan region of Pakistan. (DE 148). In addition, Individual #1 expressly informed Hasbajrami that he could be located through members of Tehrik-i-Taliban Pakistan ("TTP"), more commonly known as the Pakistani Taliban, a designated foreign terrorist organization. Individual #1 and Hasbajrami also discussed, via email, the fact that Hasbajrami would need to bring enough money with him to the FATA to purchase a weapon. (Id.).

On May 10, 2011, Hasbajrami received an email from Individual #1 explaining that "operations" had started and were going well. (Id.). In addition, Individual #1 represented that westerners, including Americans, were being killed and captured every day. (Id.). Over the next few months, Hasbajrami pursued a route into the FATA, where, his email statements suggest, he hoped to personally join the fight. (PSR ¶ 2; DE 148).

b. Hasbajrami's Attempts to Travel
Overseas to Support Terrorism

On August 9, 2011, Hasbajrami purchased a one-way ticket to Istanbul, Turkey, via Portugal. (DE 148). Four days later, Hasbajrami cancelled the ticket, explaining in an email that "the road" to jihad was problematic. (Id.). However, Hasbajrami continued to offer encouragement to Individual #1 via email, stating that he would provide whatever he had left when he arrived

in the FATA.  (Id.).  On September 3, 2011, in an effort to gauge the depth and scope of Hasbajrami's intent with respect to international terrorism, a confidential source ("CS") working with the FBI sent Hasbajrami an email indicating that he could assist Hasbajrami with travel.  (Id.).

The CS indicated that he was a member of the Islamic Jihad Union ("IJU"), a designated foreign terrorist organization that has engaged in attacks on Americans troops in Afghanistan and other countries.  On September 5, 2011, the CS explained that Individual #1's group was a different group than the IJU and that it was Hasbajrami's choice whether to travel with the assistance of Individual #1's group or to seek the assistance of the IJU. (Id.).  That same day, Hasbajrami purchased a one-way ticket to Istanbul, Turkey, for a flight departing on September 6, 2011, from John F. Kennedy International Airport ("JFK") in Queens, New York.  (Id.).

### c.   Hasbajrami's Arrest

On September 6, 2011, Hasbajrami emptied his bank account, withdrawing $1,340 in cash.  (Id.).  That afternoon, Hasbajrami took a cab to JFK, where he was arrested by FBI special agents at an international departures terminal.  (PSR ¶ 4).  At the time of his arrest, Hasbajrami was carrying, among other things, his Albanian passport (with a recently-expired Iranian

visa), a tent, boots, and cold-weather gear. (Id.). After he was arrested, Hasbajrami was interviewed by law enforcement agents. Hasbajrami was informed of, and waived in writing, his Miranda rights. (Id.; DE 148). In sum, Hasbajrami admitted that he had sent money to Individual #1 in Pakistan and that he had intended to travel to Pakistan to fight. (PSR ¶4; DE 148). FBI agents also conducted a search of Hasbajrami's residence in Brooklyn, New York. During the search, agents found, among other things, a set of handwritten notes. One of the notes stated: "Do not wait for invasion, the time is for martyrdom. Martyrdom does not come to the person. The person finds martyrdom." (DE 148).

B. The Criminal Case Against Hasbajrami

Following Hasbajrami's arrest, based on a variety of evidence including email communications, confidential human source reporting, documents recovered from Hasbajrami's apartment and his own post-arrest admissions, the government prosecuted Hasbajrami for attempting to provide material support to terrorists by offering himself and a sum of U.S. dollars to support terrorism.

1. Charges

On September 8, 2011, a grand jury in the Eastern District of New York returned an indictment charging Hasbajrami with one count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A(a). On January 26, 2012, the grand

jury returned a superseding indictment, which included three additional counts of providing and attempting to provide material support, consisting principally of money (some of which was to be used for weapons) and personnel (himself). (A 24). Hasbajrami's statutory maximum sentence if convicted of all counts in the superseding indictment was sixty years' imprisonment.

## 2. FISA Notice

On September 13, 2011, a few days after Hasbajrami's arrest, the government filed notice advising Hasbajrami that the government intended to offer into evidence, or otherwise use or disclose "information obtained or derived from electronic surveillance and physical searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ('FISA'), as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829." (DE 9). Under these provisions, electronic surveillance is commonly referred to as Title I collection, while a physical search is commonly referred to as Title III collection.[2]

## 3. Request for CIPA Conference

On September 29, 2011, the government filed a letter requesting a conference pursuant to the Classified Information Procedures Act ("CIPA"), signaling to the district court and to

---

[2]    As discussed further below, surveillance conducted pursuant to Section 702 of the FAA is commonly referred to as Title VII collection.

the defense that the government anticipated filing motions relating to potentially relevant classified material in the possession of the government. (DE 10). Thereafter, the government began producing discovery on a rolling basis. (DE 11).

### 4. First Guilty Plea and Sentencing

On April 12, 2012, Hasbajrami pleaded guilty to Count Two of the superseding indictment, which charged him with attempting to provide material support to terrorists in violation of 18 U.S.C. § 2339A(a). At sentencing on January 8, 2013, the district court imposed the statutory maximum 15 years' imprisonment. Judgment was entered on January 16, 2013. (DE 45). Hasbajrami did not file a direct appeal, and his conviction and sentence became final on January 30. As discussed further below, thereafter, on December 3, 2013, Hasbajrami filed a pro se "motion to vacate, set aside, or correct" his conviction and sentence, which the district court deemed a motion under 28 U.S.C. § 2255. (DE 61).

### 5. Supplemental FAA Notice

After Hasbajrami's criminal case had been resolved by plea, and while his Section 2255 motion was pending, the government determined that evidence obtained or derived from Title I or Title III FISA collection in Hasbajrami's case was itself derived from other surveillance that had been conducted pursuant to Section

702. The government further determined that Hasbajrami was an "aggrieved person" with respect to this surveillance because he was a participant in some of the intercepted communications, such that notice was appropriate. Accordingly, on February 24, 2014, the government provided a supplemental notification stating that, "pursuant to 50 U.S.C. §§ 1806(c) and 1881e(a), the government intended to offer into evidence or otherwise use or disclose in proceedings in the above-captioned matter information derived from acquisition of foreign intelligence information conducted pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended, 50 U.S.C. § 1881a." (DE 65). The supplemental notification was based on "a recent determination by the government that certain evidence or information obtained or derived from Title I and Title III FISA collection in this case was itself also derived from other collection pursuant to Title VII of FISA," as to which Hasbajrami was aggrieved. Accordingly, the government informed Hasbajrami that "certain evidence and information, obtained or derived from Title I or Title III FISA collection, that the government intended to offer into evidence or otherwise use or disclose in proceedings in this case was derived from acquisition of foreign intelligence information conducted pursuant to the FAA." (DE 65).

On June 30, 2014, Hasbajrami filed a motion seeking additional discovery relating to the government's supplemental

notice. (DE 76). The government addressed Hasbajrami's claims in the context of his § 2255 petition based on Fourth Amendment caselaw relating to discovery in the plea context. (DE 79). On September 20, 2014, at the district court's request, Hasbajrami filed a letter confirming his desire to withdraw his guilty plea in light of the government's supplemental notice. (DE 84). On October 2, 2014, the district court permitted Hasbajrami to withdraw his plea. (DE 85).

C.    FISA Litigation in the District Court

Following Hasbajrami's withdrawal of his guilty plea, the district court set a scheduling order relating to Hasbajrami's inclination to move to suppress the fruits of 702 surveillance in his now-revived criminal case, which included a constitutional challenge to the FAA, and the government's previously stated need to address arguably relevant classified information in its possession, pursuant to CIPA.

1. CIPA Litigation

On January 9, 2015, the government filed a classified ex parte motion for a protective order pursuant to CIPA Section 4 and Rule 16(d) of the Federal Rules of Criminal Procedure, which proposed disclosing arguably relevant information to the defense

in the form of summary substitutions.[3]  (DE 103).  "The Court conducted multiple in camera, ex parte conferences" in connection with the government's motion.[4]  (DE 111).

On March 3, 2015, the district court granted the government's application for a protective order pursuant to CIPA and Rule 16(d) of the Federal Rules of Criminal Procedure. (DE 111).  The court stated that:

> After ex parte, in camera inspection and consideration of the Submission, I find, pursuant to Section 4 of CIPA and Rule 16(d)(1), that the government's submission contains classified information that requires protection against unauthorized disclosure for reasons of national security. Specifically, I find that disclosure of the classified documents to the defense, or to the public, reasonably could be expected to cause serious damage, in some instances, exceptionally grave damage, to national security.

(Id.).  The court approved the disclosure to the defense of two summaries of potentially relevant information, as "S1" and "S2." (Id.).

### 2.  Hasbajrami's Challenge to the FAA

Contemporaneous with the CIPA litigation and the district court's review of classified information in this case, on

---

[3]  A copy of the government's classified brief is available through the Classified Information Security Officer ("CISO").

[4]  Transcripts of these classified proceedings are available to the Court through the CISO.

November 26, 2014, Hasbajrami moved to suppress the fruits of FAA surveillance on multiple grounds. (DE 92). On December 23, 2014, the government filed a classified ex parte brief, pursuant to 50 U.S.C. §§ 1806(f), 1825(g) and 1881e(a), addressing certain sensitive facts that related to the government's surveillance pursuant to Titles I and III and Section 702 of FISA.[5] The government also filed a redacted, unclassified version of that brief, which set forth the law on which the government's arguments were based as well as other unclassified facts relating to the case. (DE 97). In addition, the government filed a separate unclassified brief addressing a subset of Hasbajrami's arguments that did not implicate the disclosure of classified information. (DE 98).

On February 20, 2015, the district court denied Hasbajrami's motion to suppress the fruits of FAA surveillance in its entirety, indicating that an opinion would follow.[6] The district court also inquired whether the government intended to offer a plea agreement, and whether the government had considered

---

[5] In invoking its claim of privilege over the classified materials, the government relied upon the sworn declaration of the Attorney General, as expressly contemplated by the statute. (DE 97, Ex. A); see 50 U.S.C. § 1806(f).

[6] As discussed below, the district court issued that opinion in March 2016 after Hasbajrami had appealed from his conviction.

allowing Hasbajrami to enter such a plea pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, reserving his right to appeal the district court's denial of Hasbajrami's motion to suppress evidence.  (DE 2/20/15).

D.    Hasbajrami's Second Guilty
      Plea, Sentencing, and Appeal

On June 26, 2015, Hasbajrami pleaded guilty once again, this time to a superseding information charging him with providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, and conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 371.  The plea agreement contemplated that Hasbajrami could be sentenced to as much as 20 years' imprisonment, with no mandatory minimum sentence, and expressly preserved Hasbajrami's right to appeal the district court's denial of his motion to suppress the fruits of FAA surveillance, as well as to appeal any sentence of more than fifteen years.  Hasbajrami also stipulated to the Guidelines analysis and to the entry of a Judicial Removal Order, which would facilitate his removal to Albania at the conclusion of his sentence.[7]  (A 45).

---

[7]    On July 16, 2015, Hasbajrami moved, pro se, to withdraw his second guilty plea on the basis that he had been pressured to plead guilty by one of his attorneys.  (DE 146).  On August 6, 2015, the district court denied Hasbajrami's motion, following a hearing at which Hasbajrami and his attorneys were present and at

On August 13, 2015, the district court sentenced Hasbajrami to 192 months of imprisonment: 180 months on Count One and twelve months on Count Two, to run consecutively to each other. (DE 151). The final amended judgment was entered on November 3, 2015. (DE 161). Hasbajrami appealed, initiating the lead appeal in this case (No. 15-2684).

Later, on February 23, 2016, the district court announced that it had issued an opinion explaining its denial of Hasbajrami's suppression motion and that the court had (on Februrary 18, 2016) given that presumptively classified opinion to government counsel and the court security officer for review. (DE 2/23/2016). Hasbajrami subsequently moved this Court to hold his appeal in abeyance pending disclosure of the opinion to his counsel. (15-2684, DE 41). On February 25, 2016, this Court granted that motion. (15-2684, DE 45).

E. Ongoing District Court Proceedings
   and Hasbajrami's Second Appeal

   1. The District Court's Opinion
      Explaining its Denial of
      Hasbajrami's Claims Regarding the FAA

On March 8, 2016, the district court issued an unclassified memorandum and order setting forth its reasoning for denying Hasbajrami's motion to suppress the fruits of the

---

which the court inquired to its satisfaction into the facts underlying Hasbajrami's application.

government's FAA surveillance.[8] (A 69-95). In his memorandum, Judge Gleeson set forth the relevant facts, as well as the history and provisions of the FAA, before denying Hasbajrami's motion. In sum, the district court found that, "[b]ecause Section 702 does not require a warrant before the government can seize the communications of non-U.S. persons abroad, the dispute before me centers on whether the search of communications between a U.S. person and individuals who are legitimate targets of 702 surveillance is constitutional. . . . I conclude that it is." (A 82).

Relying on the well-settled principle that the Fourth Amendment does not apply to foreign persons abroad, the district court held, inter alia, that "because the warrant requirement is inapplicable here, so too is the need to establish probable cause or individualized suspicion." (A 83). Noting that "Courts have long dealt with the issue of incidental interception of non-targeted persons' communications" in the context of Title III wiretaps, the district court similarly found that incidental collection of a U.S. person's communication with a lawfully targeted non-U.S. person "does not require a separate warrant."

---

[8] As noted on the docket sheet, on January 23, 2015, the district court rejected Hasbajrami's claim of outrageous government conduct. Hasbajrami has not challenged that ruling in this appeal.

(A 84). Relying in part on a district court decision from Oregon, which has since been affirmed by the Ninth Circuit, the district court observed that "whether it is the domestic surveillance of U.S. persons pursuant to a warrant, or the warrantless surveillance of non-U.S. persons who are abroad — the incidental interception of non-targeted U.S. persons' communications with the targeted person is also lawful." (A 85) (citing <u>United States v. Mohamud</u>, Cr. No. 3:10-CR-00475-KI-1, 2014 WL 2866749, at *15 (D. Or. June 24, 2014)).

The district court further held that "PRISM collection"[9] at issue in this case (as distinguished from "upstream" collection, which is not implicated here) is reasonable under the Fourth Amendment. (A 86). To reach this conclusion, the court observed first that "the 702 surveillance at issue here furthered an indisputably compelling government interest." (A 86) (citations omitted). The court also found that "a person's expectation of privacy in email communications diminishes after sending the email

---

[9] As the district court explained, in PRISM collection, the government identifies the user accounts it wants to monitor and sends a "selector" — a specific communications facility, such as a target's email address or telephone number — to the relevant communications service provider. A government directive compels the communications service provider to give it communications sent to or from that selector. This type of surveillance, which intercepts "to/from" communications, can result in the incidental collection of communications with a U.S. person if the target happens to communicate with such a person. (A 79-80).

because he or she assumes the risk that the recipient will share the communication with others." (A 87) (citations omitted). The court further found that, as with traditional postal mail, Hasbajrami's expectation of privacy was diminished by transmission to a third party. (A 88).

The district court also found that the safeguards and procedures implemented in Section 702 sufficiently protect the privacy interests of non-targeted U.S. persons. (A 88). The court noted that "[h]ere, once the government learned that the target [of the subsequent FISA surveillance] was potentially an agent of a foreign power, the government sought orders from the FISC for electronic surveillance and physical searches pursuant to Title I and Title III of FISA." (A 90). The district court thus held:

> In evaluating the totality of the circumstances and weighing the government's interest in national security with Hasbajrami's diminished privacy interest, the government's interest outweighs the intrusion. The stringent safeguards embodied in the FAA, _i.e.,_ its targeting and minimization procedures, ensured that only the communications of non-U.S. persons abroad were collected. And the targeting that took place in this case was as particular as it gets—the FISC approved the targeting of specific non-U.S. persons outside the United States for specific counterterrorism purposes. The incidental interception of Hasbajrami's emails as a consequence of that lawful surveillance does not alter the reasonableness of the interception.

(A 91).

The district court also found that the "traditional" FISA surveillance, through which the government obtained the evidence at issue in this case, was lawful. (A 91-93). Based on its review of the relevant classified materials, the district court found that, with respect to the government's FISA surveillance, "the government's detailed and complete submissions in this case would easily allow it to clear a higher standard of review." (A 92) (quotation marks and citation omitted). The district court explained that "the government obtained – pursuant to Section 702 surveillance – many email communications between Hasbajrami and non-U.S. persons reasonably believed to be located outside the United States" and "described these emails in its Title I and Title III FISA applications targeting an agent of a foreign power, and they supported the FISC's finding of probable cause." (A 92-93).

The district court rejected Hasbajrami's claims that he was entitled to discovery relating to FISA and Section 702. (A 94). Acknowledging the general preference for adversarial proceedings, the district court found that, "[a]fter careful review of the FISA and Section 702 materials here it is clear to me that disclosure was unnecessary here." (A 94). The court added, "My review of the materials was relatively straightforward and not complex, and I was able to evaluate the legality of the challenged surveillance without concluding that due process first

warranted disclosure." (A 94) (quotation marks and citation omitted). Accordingly, the district court denied Hasbajrami's motion in its entirety.

The district court partially redacted two sentences in its public opinion. (A 89-90, 92). As discussed further below, the district court also indicated that some of the court's original language had been revised at the request of the government. (DE 165).

2. The District Court's Rejection of Hasbajrami's Requests for Access to the Classified Information Contained in Judge Gleeson's Initial Opinion

In the March 8, 2016 docket entry accompanying the district court's unclassified opinion, the district court noted:

> There are several instances in this memorandum where language has been substituted, and two instances where language has been redacted, from that in the presumptively classified opinion given to the classified information security officer on February 18, 2016. These substitutions and redactions reflect the government's decision that the material redacted would "expose government equities."

(DE 165).

While this appeal was held in abeyance, Hasbajrami twice moved the district court for access to the classified information that had been included in its initial memorandum and order, first on July 25, 2016 (DE 168) and again after that motion was denied (see DE 171; A 96-109) in a motion for reconsideration on April

17, 2017 (DE 172). Chief Judge Irizarry, who had taken over the case upon Judge Gleeson's departure from the bench, denied Hasbajrami's request in orders dated April 6 and August 22, 2017. (DE 171, 174; A 96-112).

In the order denying Hasbajrami's motion for reconsideration, the district court explained that the court had previously "determined that neither the Classified Information Procedures Act ("CIPA") nor the Foreign Intelligence Surveillance Act ("FISA") compels or allows disclosure of an unredacted copy of Judge Gleeson's opinion." (A 111). Quoting its previous order of April 6, 2017, the district court further explained that, "[u]nder FISA, this Court determined that Defendant's counsel was not entitled to an unredacted copy of Judge Gleeson's opinion because releasing it would reveal classified foreign intelligence information and circumvent FISA by undermining the purpose of section 1806(f)." (Id.). The district court further found that "FISA does not mandate disclosure in order to help defendants make an appeal." (Id.).

Chief Judge Irizarry also ruled that "CIPA does not compel or regulate the discovery of classified information contained in a court's written opinion." (A 111). The district court noted that, "[b]ecause Judge Gleeson conducted his review of the classified materials by relying on FISA, the Court holds that

FISA determines whether or not Defendant's attorneys have a 'need-to-know' the contents of the Unredacted Opinion." (Id.). The court concluded that, "[a]pplying FISA, defense counsel do not have a 'need-to-know' the contents of the Unredacted Opinion" and found that "[t]he redacted content neither facilitates countering the government's case nor bolsters a defense." (A 111-12).

Hasbajrami appealed from the denial of his motion to obtain the classified version of the district court's opinion, which initiated the second appeal before this Court (No. 17-2669). (DE 175). Shortly thereafter, this Court ordered that Hasbajrami's first appeal be lifted out of abeyance. (15-2684, DE 76).

SUMMARY OF ARGUMENT

I. The government did not violate the Fourth Amendment by conducting surveillance pursuant to Section 702 of the foreign person or persons with whom Hasbajrami was communicating.[10] First, the Fourth Amendment generally does not apply to non-U.S. persons abroad. That surveillance targeting such persons may incidentally collect communications of U.S. persons does not trigger a warrant requirement under well-established principles and precedent. Second, such surveillance falls within the "foreign intelligence exception" to the warrant requirement.

Because a warrant was not required to conduct the surveillance authorized by Section 702, the applicable Fourth Amendment test is whether the surveillance was reasonable under the circumstances. That standard was satisfied in this case. The government's compelling interest in obtaining foreign intelligence information to protect the United States from the threat of international terrorism outweighs the privacy interests of U.S. persons whose communications with foreign persons located abroad are incidentally collected where, as here, Congress has imposed

---

[10] Hasbajrami is correct that this Court reviews a district court's ruling concerning the constitutionality of a statute de novo. (HBr. 18); see, e.g., United States v. Dhafir, 461 F.3d 211, 215 (2d Cir. 2006).

and the government has followed reasonable statutory safeguards protecting such privacy interests.

Under the FAA, the privacy interests of U.S. persons are protected by multiple statutory requirements, including: (1) certification by Executive Branch officials concerning the permissible foreign intelligence purposes of the collection; (2) court-approved targeting procedures designed to direct the surveillance only at non-U.S. persons abroad; (3) court-approved minimization procedures designed to protect the privacy interests of U.S. persons whose communications are incidentally acquired; (4) the benchmark requirement that the purpose of the surveillance be significant with respect to obtaining foreign intelligence information; (5) oversight by the Executive Branch, Congress and the FISC; and (6) reliance on judicial findings that the targeting and minimization procedures are consistent with FISA and the Fourth Amendment.

Finally, even if the surveillance in this case violated the Fourth Amendment, the good-faith exception to the exclusionary rule would apply because the government acted in objectively reasonable reliance upon a statute.

II.  Hasbajrami's argument that the government violated the requirements of Section 702 in this case is without merit. The district court properly found, after reviewing the

government's classified submissions, that the government complied with the statutory requirements in conducting 702 surveillance, as well as in the FISA surveillance that was derived from that surveillance.[11]  Hasbajrami's complaint that the court improperly relied upon ex parte submissions in making that determination is without merit.   This Court has upheld a district court's consideration of classified, ex parte submissions in cases involving FISA surveillance.  The district court in this case explained that its review of the classified record was "straightforward" and that therefore disclosure to the defense was not necessary to assist the court in making its determination concerning the legality of the surveillance.

III.   Finally, there is no merit to Hasbajrami's assertion that his due process rights "may" be violated if the appeal is adjudicated without his receiving access to the district court's unredacted opinion.  As the rulings of both Judge Gleeson

---

[11]   Hasbajrami's assertion that this issue raises a mixed question of law and fact that should be reviewed de novo (HBr. 18) is flawed in two respects. First, the application of Section 702 to this case raises questions of historical fact (i.e., what the government did or did not do in conducting surveillance).  Second, it is not true that this Court invariably reviews mixed questions of fact and law de novo.  Instead, the Court will apply either a de novo or clearly erroneous standard "depending on whether the question is predominantly legal or factual."  United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005).

and Chief Judge Irizarry reflect, Hasbajrami does not need the redacted information to pursue this appeal.[12]

---

[12]    Access to a classified court decision containing FISA information is governed by 50 U.S.C. § 1806(f).  The district court's Section 1806(f) determination is subject to review for an abuse of discretion.  See United States v. Duggan, 743 F.2d 59, 78 (2d Cir. 1984); see also United States v. El-Mezain, 664 F.3d 467, 566-67 (5th Cir. 2011).

ARGUMENT

POINT ONE

THE SECTION 702 SURVEILLANCE
DID NOT VIOLATE THE FOURTH AMENDMENT

I.   The Legal Framework for Foreign Intelligence Collection

This case involves a Fourth Amendment challenge to the government's collection of foreign-intelligence information by targeting email accounts of non-United States persons[13] located abroad pursuant to statutory authority in the FAA, i.e., pursuant to Section 702 of FISA, 50 U.S.C. § 1881a, where that collection incidentally acquired email communications between Hasbajrami and the foreign targets and the government subsequently used evidence derived from those emails against Hasbajrami.  The FAA's provisions build upon and supplement preexisting FISA provisions.  This brief accordingly sets the stage by discussing FISA and the FAA's amendments thereto before directly addressing Hasbajrami's Fourth Amendment contentions.

A.   The Foreign Intelligence Surveillance Act

In 1978, Congress enacted FISA "to regulate the use of

---

[13]   The public record does not disclose whether the Section 702 surveillance that incidentally collected Hasbajrami's emails relevant to this case targeted the email account or accounts of a single non-U.S. person located abroad, or more than one such person.  For linguistic economy, this brief refers to the target or targets of the Section 702 collection in the plural.

electronic surveillance within the United States for foreign intelligence purposes." S. Rep. No. 95-604, at 7 (1977). Before the United States may conduct "electronic surveillance," as defined in FISA, to obtain foreign intelligence information, the government generally must obtain an order from a FISC judge. See 50 U.S.C. §§ 1805, 1809(a)(1); see also 50 U.S.C. §§ 1803(a), 1804(a). To obtain such an order, the government must establish, inter alia, probable cause to believe that the "target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(2). The electronic surveillance authorized under such an order must be conducted pursuant to procedures that the FISC judge has determined are reasonably designed to minimize the acquisition and retention, and prohibit the dissemination, of nonpublic information concerning unconsenting "United States persons," consistent with the government's need to obtain, produce, and disseminate foreign intelligence information. See 50 U.S.C. §§ 1801(h), 1805(a)(3) and (c)(2)(A).

Under FISA as originally enacted, only "electronic surveillance" was subject to the requirement of a judicial order based on probable cause. FISA's original "electronic

surveillance" definition did not apply to most of the government's extraterritorial surveillance.[14]   This was true even if that surveillance might specifically target U.S. persons abroad or incidentally acquire, while targeting third parties abroad, communications to or from U.S. persons or persons located in the United States.  See S. Rep. No. 95-701, 7 & n.2, 34-35 & n.16 (1978).[15]   At the time of FISA's enactment, the acquisition of international communications did not rely on the four types of "electronic surveillance" defined in the proposed legislation — including wire interceptions executed in the United States — and thus those operations would not be affected by FISA.  See Foreign

---

[14]   In FISA, Congress defined "electronic surveillance" to include four discrete types of domestically-focused foreign intelligence collection activities:  (1) acquiring wire or radio communication by "intentionally targeting" a "particular, known United States person who is in the United States" in certain circumstances;  (2) acquiring wire communication to or from a "person in the United States" when the "acquisition occurs in the United States";  (3) intentionally acquiring certain radio communications when the "sender and all intended recipients are located within the United States"; and (4) the installation or use of a surveillance device "in the United States" for monitoring or to acquire information other than from a wire or radio communication in certain circumstances.  50 U.S.C. § 1801(f) (emphasis added); cf. 50 U.S.C. § 1801(i) (defining "United States person" to mean, as to natural persons, a citizen or permanent resident of the United States).

[15]   Executive Order No. 12,333, as amended, addresses, inter alia, the government's "human and technical collection techniques . . . undertaken abroad."  Exec. Order No. 12,333, § 2.2, 3 C.F.R. 210 (1981 Comp.), reprinted as amended in 50 U.S.C. § 401 note (Supp. II 2008).

Intelligence Surveillance Act: Hearing before the Subcomm. On Crim. Laws and Procedures of the S. Judiciary Comm., 94th Cong., 2d Sess., at 11 (Mar. 29, 1976 et seq.) ("Mar. 29, 1976 FISA Hrg."). Accordingly, Congress understood that most foreign-to-foreign and international communications fell outside the definition of "electronic surveillance." See S. Rep. No. 95-701, at 71 ("[T]he legislation does not deal with international signals intelligence activities as currently engaged in by the National Security Agency."). Where the government did not intentionally target a particular, known U.S. person in the United States, FISA allowed the government to monitor international communications through radio surveillance, or wire surveillance of transoceanic cables offshore or on foreign soil, outside the statute's regulatory framework.

B.    The FISA Amendments Act

By 2008, many international communications that would have been generally excluded from FISA regulation in 1978, when they were carried by radio, were now transmitted principally by fiber optic cables and therefore potentially qualified as wire communications under FISA. See Modernization of the Foreign Intelligence Surveillance Act: Hearing before the S. Select Comm. On Intelligence, 110th Cong., 1st Sess. 19 (2007) ("FISA Modernization Hrg."), at 19. Once that change occurred, FISA

potentially regulated the surveillance of international communications that were previously not covered by the statute, due merely to a change in technology rather than any purposeful legislative decision.  Id.[16]

The government in 2008 thus faced different communications technology, as well as a different terrorist threat, and it therefore needed greater flexibility than FISA allowed.  The fix needed was a "technology-neutral" framework for surveilling foreign targets — focused not on "how a communication travels or where it is intercepted," but instead on "who is the subject of the surveillance, which really is the critical issue for civil liberties purposes."  May 1, 2007 FISA Modernization Hrg. at 46 (statement of Asst. Att'y Gen. Kenneth L. Wainstein).

In July 2008, Congress enacted the FISA Amendments Act of 2008, Pub. L. No. 110-261, § 101(a)(2), 122 Stat. 2436, which enacted a new Section 702 of FISA.[17]  Section 702 (50 U.S.C.

---

[16]  Compare 50 U.S.C. § 1801(f)(2) (defining wire communication as "electronic surveillance" if, inter alia, one party is in the United States) with 50 U.S.C. § 1801(f)(3) (defining radio communication as "electronic surveillance" only if the sender and all intended recipients are in the United States).

[17]  In 2012, Congress reauthorized the FAA for an additional five years, until December 31, 2017.  See FISA Amendments Act Reauthorization Act of 2012, Pub. L. No. 112-238, 126 Stat. 1631. On December 21, 2017, the House and Senate voted 238-188 and 66-32, respectively, to pass a continuing resolution extending government funding until January 19, 2018.  One provision of that

§ 1881a) "supplements pre-existing FISA authority by creating a new framework under which the Government may seek the FISC's authorization of certain foreign intelligence surveillance targeting . . . non-U.S. persons located abroad." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1144 (2013).

Under Section 1881a(b), an authorized acquisition must meet each of the following requirements, which are directed at preventing the intentional targeting of U.S. persons or persons located within the United States, or collection of communications known at the time of acquisition to be purely domestic:

(1) The authorized acquisition "may not intentionally target any person known at the time of acquisition to be located in the United States." 50 U.S.C. § 1881a(b)(1).

(2) The government may not intentionally target a person outside the United States "if the purpose . . . is to target a particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2).

(3) It "may not intentionally target a United States person reasonably believed to be located outside

---

bill extended the FISA Amendments Act Section 702 deadline to that date.

the United States." 50 U.S.C. § 1881a(b)(3).

(4) It may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States. 50 U.S.C. § 1881a(b)(4).

(5) The acquisition must be "conducted in a manner consistent with the [F]ourth [A]mendment." 50 U.S.C. § 1881a(b)(5).

Section 702 does not require an individualized court order addressing each non-U.S. person to be targeted under its provisions. Section 702 instead permits the FISC to approve annual certifications by the Attorney General and Director of National Intelligence (the "DNI") that authorize the acquisition of certain categories of foreign intelligence information — such as information concerning international terrorism and the acquisition of weapons of mass destruction — through the targeting of non-U.S. persons reasonably believed to be located outside the United States.

C.  Submission to the FISC for Approval

Section 702 requires the government to obtain the FISC's approval of (1) the government's certification regarding the proposed collection, and (2) the targeting and minimization

procedures to be used in the acquisition.  50 U.S.C. § 1881a(a), (c)(1), (i)(2), (3); see 50 U.S.C. § 1881a(d), (e), (g)(2)(B). The Attorney General and DNI must certify that

(1) there are targeting procedures in place, that have been or will be submitted for approval by the FISC, that are reasonably designed to ensure that the acquisition is limited to targeting persons reasonably believed to be located outside the United States and to prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States;

(2) the minimization procedures meet the definition of minimization procedures set forth in Titles I and III of FISA (50 U.S.C. §§ 1801(h), 1821(4)) and have been or will be submitted for approval by the FISC;

(3) guidelines have been adopted by the Attorney General to ensure compliance with the aforementioned limitations set forth in Section 1881a(b) prohibiting, among other things, the targeting of United States persons;

(4) the targeting and minimization procedures and guidelines are consistent with the Fourth Amendment;

(5) a significant purpose of the acquisition is to obtain foreign intelligence information;

(6) the acquisition involves obtaining "foreign intelligence information from or with the assistance of an electronic communication service provider"; and

(7) the acquisition complies with the limitations in Section 1881a(b).[18]

50 U.S.C. § 1881a(g)(2)(A)(i)-(vii); see 50 U.S.C. §§ 1801(h), 1821(4), 1881a(b); cf. 50 U.S.C. §§ 1801(e), 1881(a) (defining "foreign intelligence information").

D.    The FISC's Order

The FISC must then review the certification, targeting and minimization procedures, and any amendments thereto. See 50 U.S.C. § 1881a(i)(1) and (2). If the FISC determines that the certification contains all the required elements and concludes that the targeting and minimization procedures are "consistent with" both the Act and "the [F]ourth [A]mendment," the FISC will issue an order approving the certification and the use of the targeting and minimization procedures. See 50 U.S.C. § 1881a(i)(3)(A).

---

[18]    Those limitations, as described above, generally prevent intentionally targeting United States persons or persons located within the United States or collection of communications when the sender and all intended recipients are known at the time of collection to be in the U.S.

E.    Implementing Section 702 Authority

The government acquires communications pursuant to Section 702 through compelled assistance from electronic communications service providers.  50 U.S.C. § 1881a(h).  The government identifies to these service providers specific communications facilities, such as email addresses and telephone numbers, that the government has assessed, through the application of FISC-approved targeting procedures, are: (1) reasonably believed to be used by non-U.S. persons located abroad, (2) who possess, communicate, or are likely to receive a type of foreign intelligence information authorized for collection under a FISC-approved certification.  The government must identify specific communications facilities, not key words or the names of targeted individuals.  See Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act ("PCLOB Report") 32–33; 41-46 (July 2, 2014).[19]

---

[19]    Available    at    https://www.pclob.gov/library/702-Report.pdf.  The Privacy and Civil Liberties Oversight Board is an independent agency within the Executive Branch.  After conducting an in-depth review of the Section 702 program, the Board found that the "core of the Section 702 program—acquiring the communications of specifically targeted foreign persons who are located outside the United States, upon a belief that those persons are likely to communicate foreign intelligence, using specific communications identifiers, subject to FISA court-approved targeting rules and multiple layers of oversight," was reasonable under the Fourth Amendment.  PCLOB Report at 9.

The FISC has approved authorizations to acquire foreign intelligence information under a series of Section 702 certifications dating back to 2008. The FISC has found that acquisitions under Section 702 fall within the foreign-intelligence exception to the Fourth Amendment's warrant requirement because they target "persons reasonably believed to be located outside the United States," who are "not protected by the Fourth Amendment," and such targets "will have been assessed by [the government] to possess and/or to be likely to communicate foreign intelligence information." In re DNI/AG Certification, No. 702(i)-08-01, Mem. Op. at 35, 37.[20] The FISC has also concluded, after considering in detail the targeting and minimization procedures, that the acquisitions satisfied the Fourth Amendment's reasonableness requirement "in view of the gravity of the government's national security interests and the other safeguards embodied in the targeting and minimization procedures." Id. at 38, 41.

F.   Oversight

Section 702 requires that the Attorney General and DNI periodically assess the government's compliance with targeting and minimization procedures and relevant compliance guidelines and

---

[20]   Available on the DNI's website at http://www.dni.gov/files/documents/0315/FISC%20Opinion%20September%204%202008.pdf.

that they submit those assessments to the FISC and to Congressional oversight committees.  See 50 U.S.C. § 1881a(l).  In addition, at least once every six months, the Attorney General must "fully inform" relevant congressional oversight committees concerning Section 702's implementation.  See 50 U.S.C. § 1881f(a) and (b)(1); see also Clapper, 568 U.S. at 404 ("Surveillance under [Section 702] is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment.").

## II.  The Surveillance in this Case Was Lawful Under the Fourth Amendment

The acquisition of Hasbajrami's communications, through FISC-authorized FISA surveillance that was predicated on 702 collection, did not violate the Fourth Amendment.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and that "no Warrants shall issue, but upon probable cause."  U.S. Const. Amend. IV.  As the Supreme Court has explained, although the concepts of probable cause and a warrant requirement bear on the reasonableness of a search, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance."  Nat'l Treas. Employees Union v. Von Raab, 489 U.S. 656, 665 (1989); New Jersey v. T.L.O.,

469 U.S. 325, 340 (1985). The touchstone of analysis under the Fourth Amendment is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (per curiam) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)).

Every court to consider the issue has held that surveillance conducted in accordance with Section 702 is reasonable and comports with the Fourth Amendment. Indeed, since the district court issued its opinion in this case, the Ninth Circuit has unanimously affirmed a similar ruling. The court of appeals in Mohamud reasoned that "because the target of the surveillance was a non-U.S. person located outside of the United States at the time of the surveillance, the government was not required to obtain a search warrant to collect" the email communications of a U.S. person with the foreign national "as an incident to its lawful collection of the foreign national's email" under Section 702. United States v. Mohamud, 843 F.3d 420, 441 (9th Cir. 2016), cert. denied, 2018 WL 311442 (U.S. Jan. 8, 2018). The Ninth Circuit further concluded that "[e]ven assuming [the defendant] had a Fourth Amendment right in the incidentally collected communications, the search was reasonable." Id. at 444. This Court should reach a similar conclusion: (1) the Fourth Amendment does not require a warrant to conduct Section 702

surveillance targeting a non-United States person abroad and (2) Section 702 collection complies with the Fourth Amendment because it is constitutionally reasonable.

A.   The Fourth Amendment Does Not Require the Government to Obtain a Warrant before Conducting Surveillance under Section 702

Hasbajrami argues that "the fruits of all warrantless Section 702 surveillance should have been suppressed in this case and the District Court erred when it failed to do so." (HBr. 7). Hasbajrami's argument fails because the Fourth Amendment does not require a warrant to surveil the target of the government's 702 collection. Section 702 authorizes the collection of foreign-intelligence information by targeting only non-U.S. persons located outside the United States. The Fourth Amendment does not require a warrant where, as here, the government has targeted under Section 702 the email accounts of non-U.S. persons abroad, who possess no Fourth Amendment rights, to collect foreign-intelligence information even though such collection may incidentally acquire some communications between the target and a United States person. The foreign-intelligence exception to the warrant requirement also applies to surveillance conducted under Section 702.

Hasbajrami cannot identify, and the government is unaware of, any case holding that such surveillance is subject to

the Fourth Amendment's warrant requirement. The fact that communications involving U.S. persons may be incidentally intercepted in the course of foreign-intelligence surveillance of foreign persons located abroad under Section 702 can require that such incidental collection be reasonable under the totality of the circumstances, but it does not alter the principle that a warrant is not required to conduct foreign-intelligence surveillance of foreign persons located in foreign countries.

> 1. A Warrant Is Not Required To Conduct Foreign-Intelligence Surveillance <u>Targeting Non-U.S. Persons Located Abroad</u>

> a. The Fourth Amendment Generally Does <u>Not Apply to Non-U.S. Persons Abroad</u>

In <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259 (1990), the Supreme Court rejected a search-warrant requirement based on its holding that the Fourth Amendment does not "restrain the actions of the Federal Government against aliens outside of the United States" and thus does not "apply to activities of the United States directed against aliens in foreign territory," at least where, as here, such aliens abroad have no "significant voluntary connection with the United States." <u>Id.</u> at 266-67, 271; see <u>id.</u> at 263, 265. That limitation is consistent with decisions recognizing that "aliens receive [certain] constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."

Id. at 271; see id. at 275 (Kennedy, J., concurring) ("[T]he Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory."). Verdugo-Urquidez therefore reflects the "well-established" principle that Fourth Amendment protection is otherwise "unavailable" to "aliens outside of our geographic borders." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). Disregarding that limitation, as the Supreme Court has recognized, "would have significant and deleterious consequences for the United States" in national security contexts. Verdugo-Urquidez, 494 U.S. at 273.

The district court correctly applied those teachings in concluding in this case that the foreign nationals abroad whose email accounts the government targeted for Section 702 collection possessed no Fourth Amendment rights that might require a warrant. (See A 82-83); see also Mohamud, 843 F.3d at 439. Although amici argue (ABr. 16-17) that a warrant should be necessary because the foreign national's emails were obtained within the United States, that position does not comport with the Supreme Court's rationale in Verdugo-Urquidez, and amici identify no supporting authority to justify requiring a warrant to conduct foreign-intelligence surveillance of an alien who is located abroad.

As the district court correctly concluded, the critical Fourth Amendment factors here relevant to the warrant inquiry are the overseas location and foreign nationality of the target in this foreign-intelligence context, not where the government obtained the target's electronic data.  (See A 85 n.15) ("[W]hat matters here is the location of the target."); Mohamud, 843 F.3d at 439 (agreeing that the location of the target is the important factor, not "where the government literally obtained the electronic data").  Judge Gleeson further explained:

> The mere fact that Section 702 surveillance originated from within the United States, or that the communications obtained through such surveillance originated from or terminated within the United States, is not enough to trigger the warrant requirement.  The government intercepted the emails in this case because Hasbajrami communicated with foreign persons outside the United States, at email addresses believed to belong to them.  Section 702 requires that the government reasonably believe that the non-U.S. person is located outside the United States in order to target them.  50 U.S.C. § 1881a(a).  The facts here indicate that the government reasonably (and correctly) believed that the persons Hasbajrami communicated with were non-U.S. persons abroad, and thus the government was well within its boundaries.  That the seizure took place from within the United States does not alter these facts, and therefore does not implicate the warrant requirement.

(A 85) (citations omitted).

If amici were correct, the Fourth Amendment would require a warrant to conduct any foreign-intelligence surveillance

targeting the email account of any alien abroad simply because the account was acquired electronically in the United States, even if none of the alien's email communications were with a U.S. person. Such an overbroad application of the Fourth Amendment to non-U.S. persons abroad is unjustified. Nor is a warrant requirement justified to protect the rights of U.S. persons because Section 702 prohibits the targeting of a person abroad "if the purpose ... is to target a particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2). Accordingly, the Supreme Court's cases make clear that no warrant requirement arises simply because surveillance of a foreign person located abroad was technologically effected in the United States, rather than in the specific location abroad where the foreign person sent and received the electronic communications.

b. The Incidental Collection of Communications of U.S. Persons Pursuant to Intelligence Collection Lawfully Targeting Non-U.S. Persons Located Outside the United States Does Not Trigger a Warrant Requirement

Section 702 expressly prohibits the government from using Section 702 collection to intentionally target U.S. persons (or even non-U.S. persons) located within the United States by targeting a non-U.S. person abroad. 50 U.S.C. §§ 1881a(b)(2) (prohibiting such reverse targeting under Section 702); cf. id. § 1881a(b)(1) (prohibiting the direct targeting of any person

located in the United States). When the government acquires such communications, as it did here, that acquisition is the result of incidental collection in the course of intelligence and counterterrorism surveillance targeting non-U.S. persons outside the United States for which a warrant is not required. Courts repeatedly have recognized that the incidental collection of the communications of third parties that occurs as a result of constitutionally permissible acquisitions targeting others does not itself trigger an additional requirement for a warrant under the Fourth Amendment. See United States v. Khan, 415 U.S. 143, 156-57 (1974) (interception of spouse on wiretap targeting her husband); United States v. White, 401 U.S. 745, 751-53 (1971) (one party consent rule does not violate Fourth Amendment); United States v. Figueroa, 757 F.2d 466, 472-73 (2d Cir. 1985) (rejecting constitutional challenge to Title III wiretap statute on the ground that it allowed for the interception of conversations of unknown third parties); United States v. Tortorello, 480 F.2d 764, 775 (2d Cir. 1973) (holding that once the government has established a lawful basis to conduct electronic surveillance on one participant in a conversation, "the statements of other participants may be intercepted if pertinent to the investigation"); United States v. Butenko, 494 F.2d 593, 608 (3d Cir. 1974) (en banc) (upholding the constitutionality of warrantless surveillance for foreign-

intelligence purposes even though "conversations . . . of American citizens[] will be overheard"); United States v. Bin Laden, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000) ("[I]ncidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment.").

Applying analogous principles here, the incidental collection of a U.S. person's email communications during the lawful electronic surveillance of non-U.S. persons abroad in connection with an effort to protect the public from international terrorism does not trigger a requirement for a judicial warrant. The Ninth Circuit has accordingly concluded that a warrant was not required in circumstances similar to those in this case. See Mohamud, 843 F.3d at 440-41 (finding a warrant requirement inapplicable in a case involving "the targeting of a foreign national" "located overseas" under Section 702, "through which [defendant's] email communications were incidentally collected"). And the FISA Court of Review reached a similar conclusion as to incidentally collected communications under the Protect America Act ("PAA"), a statute similar to Section 702 that expired in 2008. See In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act, 551 F.3d 1004, 1015 (FISA Ct. Rev. 2008). The government acknowledges that Section 702 surveillance that incidentally collects communications involving United States

persons must be constitutionally reasonable (as discussed below), but the reasonableness requirement is logically and doctrinally distinct from the Fourth Amendment warrant requirement.

Hasbajrami and the amici contend that the acquisition of U.S. persons' communications under Section 702 is not properly considered incidental because the government contemplates that some of the foreign targets will communicate with U.S. persons and the minimization procedures permit the government in certain circumstances to retain those communications. (HBr. 45; ABr. 14). However, the same is true of traditional law enforcement Title III wiretaps in which the government collects communications of third parties who are not targets of the investigations, and those communications may nevertheless be retained and used in criminal proceedings. See, e.g., Khan, 415 U.S. at 143; see also Figueroa, 757 F.2d at 472 ("we find nothing in Scott to persuade us that the minimization requirement has become so diluted as to render Title III unconstitutional on its face"). Thus, while Section 702 collection may be expected to collect some emails between the foreign target and U.S. persons, the fact that some such communications are anticipated to occur does not itself trigger a warrant requirement. See Mohamud, 843 F.3d at 440-41; United States v. McKinnon, 721 F.2d 19, 22-23 (1st Cir. 1983) ("While an interception that is unanticipated is a fortiori incidental, the

converse is not true: something does not have to be unanticipated in order to be incidental."); (see also A 85) ("[W]hen surveillance is lawful in the first place — whether it is the domestic surveillance of U.S. persons pursuant to a warrant, or the warrantless surveillance of non-U.S. persons who are abroad — the incidental interception of non-targeted U.S. persons' communications with the targeted persons is also lawful.") (footnote omitted). In circumstances where a non-targeted U.S. person's communications are collected because that U.S. person is communicating with a foreign person abroad, the surveillance of the U.S. person is properly considered incidental. See In re Directives, 551 F.3d at 1015.

Hasbajrami argues (HBr. 50) that decisions applying the incidental collection principle are premised on the fact that a warrant had already been issued with respect to the target. But Hasbajrami draws the wrong lesson from those decisions. As the Ninth Circuit explained, those decisions involved searches "target[ing] United States citizens" conducted in the United States that themselves required "a warrant . . . for the initial search to be constitutionally permissible." Mohamud, 843 F.3d at 440. Those decisions simply teach that persons incidentally overheard do not have an independent right to a warrant targeted at them. That means that where there is no requirement of a

warrant at all — as in this foreign-intelligence context in which the government targets a non-U.S. person located abroad — a warrant requirement does not spring into being based on incidental capture of U.S. person communications.

Application of a warrant requirement to incidental interception of U.S. persons' communications during surveillance targeting non-U.S. persons abroad for foreign intelligence purposes would be inconsistent with this Court's prior holdings. See In re Terrorist Bombings of U.S. Embassies, 552 F.3d 157, 169 (2d Cir. 2008) (holding that the warrant requirement does not apply to searches or surveillance of U.S. citizens that occur outside the United States because the original purpose of the Fourth Amendment "was to restrict searches and seizures which might be conducted by the United States in domestic matters"). The Section 702 collection at issue here properly related to foreign-intelligence surveillance; the fact that it collected the communications of a U.S. person living in New York City providing material support to a foreign terrorist organization was an incidental, albeit fortunate, byproduct of foreign-intelligence collection.

Before initiating surveillance of a foreign target, the government cannot always know whether that target will communicate with U.S. persons and is not expected to be "omniscient" in this

regard.  See Bin Laden, 126 F. Supp. 2d at 280.  Thus, imposition of a warrant requirement for the potential interception of communications of U.S. persons would effectively require a warrant for all foreign intelligence collections, even though neither the foreign targets nor their foreign communicants abroad are entitled to the protections of the Fourth Amendment.  Imposing a warrant requirement for surveillance targeting foreign persons abroad would unduly restrict the government's intelligence collection and degrade its ability to protect against foreign threats because it would substantially hamper the effectiveness of foreign intelligence surveillance.  See Warrantless Surveillance and The Foreign Intelligence Surveillance Act: The Role of Checks and Balances in Protecting Americans' Privacy Rights (Hearing Before the H. Judiciary Comm., 110th Congress, 1st Sess. 8 (2007) (statement of Rep. Forbes) ("To require a court order for every instance in which a foreign target communicates with someone inside the United States is to require a court order for every foreign target, and requiring this would reverse 30 years of established intelligence gathering.").

    2.   Section 702 Surveillance Falls within
        the Foreign Intelligence Exception to
        the Warrant Requirement

An additional reason why no warrant is required is that the foreign intelligence exception justifies the procedures

established under Section 702. Section 702 surveillance is conducted only for foreign-intelligence purposes and, under a well-recognized exception to the warrant requirement, such foreign-intelligence surveillance does not require a warrant.

### a.   The "Special Needs" Doctrine

The touchstone of the Fourth Amendment is reasonableness, which is determined by balancing the degree to which a search promotes a legitimate government interest on the one hand against the degree of intrusion into a privacy interest on the other. See United States v. Knights, 534 U.S. 112, 118-19 (2001). In the traditional law enforcement context, obtaining a court-authorized warrant before executing an intrusive search is the norm. The Supreme Court has clearly articulated that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53 (1995). The Supreme Court also has recognized, however, that the warrant requirement is subject to exceptions. See id. (upholding warrantless drug testing of student athletes); see also Maryland v. King, 569 U.S. 435, 446 (2013) (finding no "irreducible requirement" for individualized suspicion under the Fourth Amendment where a buccal swab was used to obtain defendant's DNA sample without a warrant); United States

v. Flores-Montano, 541 U.S. 149, 153 (2004) (border searches not subject to warrant requirement).

One such exception to the warrant requirement exists "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873 (1987).  The Supreme Court has found that a warrant should not be required in instances where the government need is especially compelling and that need is likely to be frustrated by a warrant requirement.  See id.  The Court also has recognized exceptions to the warrant requirement where expectations of privacy are diminished and where alternative safeguards can restrain the government from exceeding the reasonable limits of intrusiveness.  See King, 569 U.S. at 446; Griffin, 483 U.S. at 873-74 (upholding warrantless search of probationer's home); Samson v. California, 547 U.S. 843, 847 (2006) (upholding suspicionless searches of parolees).

In considering whether the "special needs" doctrine applies, the Supreme Court has distinguished searches designed to uncover evidence of "ordinary criminal wrongdoing" from those conducted "at a programmatic level" in furtherance of other government interests.  See City of Indianapolis v. Edmond, 531 U.S. 32, 37-40 (2000).  Indeed, this Court has upheld searches conducted for the "programmatic purpose" of protecting the nation

against terrorist threats, which is the same interest at issue in this case. See Cassidy v. Chertoff, 471 F.3d 67, 82 (2d Cir. 2006). In Cassidy, this Court found that officials could conduct intrusive, warrantless physical searches of ferry passengers because the interests in "preventing or deterring large-scale terrorist attacks present problems that are distinct from standard law enforcement needs." Id. This Court similarly held with respect to warrantless searches of the baggage of New York City subway passengers for explosives. See MacWade v. Kelly, 460 F.3d 260, 271 (2d Cir. 2006). In finding that the special needs doctrine had been satisfied in MacWade, the Court recognized that "the fact that an officer incidentally may discover a different kind of contraband and arrest its possessor does not alter the Program's intended purpose." Id. The Court held that "the special needs doctrine does not require, as a threshold matter, that the subject of the search possess a reduced privacy interest. Instead, once the government establishes a special need, the nature of the privacy interest is a factor to be weighed in the balance." Id. at 270. Here, with respect to 702 surveillance, the government has a programmatic need to detect and disrupt acts of international terrorism that goes beyond traditional law enforcement needs.

b.    The Foreign Intelligence Exception

As a variant of the special needs doctrine, which is sufficiently flexible to account for a variety of types of searches and government interests, the courts of appeals have uniformly recognized a foreign-intelligence exception to the warrant requirement that properly applies in the context of this case. See United States v. Duka, 671 F.3d 329, 341 (3d Cir. 2011) (discussing cases including the Third Circuit's en banc decision in Butenko, 494 F.2d at 605); In re Directives, 551 F.3d at 1010-11; In re Sealed Case, 310 F.3d 717, 742 (FISA Ct. Rev. 2002) (observing that "all the . . . courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information"); United States v. Truong Dinh Hung, 629 F.2d 908, 912-16 (4th Cir. 1980) (upholding warrantless surveillance of international espionage target as reasonable where it had been authorized by the Attorney General and it occurred prior to the time that the investigation became primarily a criminal investigation); United States v. Buck, 548 F.2d 871, 875 (9th Cir. 1977) ("foreign security wiretaps are a recognized exception to the general warrant requirement"); United States v. Brown, 484 F.2d 418, 426 (5th Cir. 1973) (reaffirming that "the President may

constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence").[21]

To date, the Supreme Court has reserved consideration of the issue of a warrant requirement for foreign intelligence collection, making "no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div., 407 U.S. 297, 308 (1972). Lower courts, however, repeatedly have reinforced the proposition that foreign intelligence collection goes "beyond any garden-variety law enforcement objective." In re Directives, 551 F.3d at 1011. Moreover, as discussed further below, the FISA Court of Review has found, in the context of the PAA (Section 702's predecessor statute), that "requiring a warrant would hinder the government's ability to collect time sensitive information and, thus, would impede the vital national security interests that are at stake." Id.; see also Caption Redacted, 2011 WL 10945618, at

---

[21] One court of appeals has questioned the application of the exception, but it did so in a quite different context than is presented here. See Zweibon v. Mitchell, 516 F.2d 594, 614, 651 (D.C. Cir. 1975) (en banc) (plurality opinion) (concluding in a Bivens action that "foreign threats of retaliation" that merely were "provoked by the actions of [a] domestic organization" did not themselves justify warrantless surveillance targeting the "domestic organization" in the United States, where the targeted "organization . . . is not the agent of or acting in collaboration with a foreign power"); id. at 689, 700-01, 705 (Wilkey, J., concurring and dissenting) (concurring on that issue).

*24 (FISC Oct. 3, 2011) ("The Court has previously concluded that the acquisition of foreign intelligence information pursuant to Section 702 falls within the 'foreign intelligence exception' to the warrant requirement of the Fourth Amendment."). The "vital nationality security" interest at stake in this case is the government's ability to timely detect and disrupt international terrorism. Where, as here, surveillance targeting a foreign person in a foreign country is conducted under Section 702 as part of the government's effort to collect foreign-intelligence information, such activity falls well within the special-needs doctrine and the foreign intelligence exception to the warrant requirement.

Courts have "acknowledged wide discretion afforded the executive branch in foreign affairs." In re Terrorist Bombings, 552 F.3d at 170 n.7; see also Truong, 629 F.2d at 914 ("[T]he executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs."). And although the Attorney General and the DNI do not personally approve each individual acquisition under Section 702, the Attorney General and the DNI play a significant role in establishing and authorizing the certification and procedures that govern the acquisition, which can occur only to collect foreign-intelligence surveillance by targeting a non-U.S. person located abroad. See 50 U.S.C.

§ 1881a(a). Moreover, unlike the unilateral executive-branch surveillance at issue in Truong, Section 702 collection is governed by strict, court-approved procedural safeguards and extensive oversight by the Executive Branch, the FISC, and Congress. Those requirements provide sufficient authorization and oversight, by all three branches of government, for purposes of the foreign-intelligence exception. Accordingly, the Fourth Amendment does not require that courts further approve the Executive Branch's collection of foreign intelligence in advance through issuance of a warrant, as courts normally would do in criminal matters involving traditional search warrants.

c. The Government's Purpose in Conducting Surveillance Under Section 702 Goes Beyond Ordinary Crime Control

Acquisition under Section 702 must, by the plain language of the statute, be conducted with a "significant purpose" to "obtain foreign intelligence information." 50 U.S.C. § 1881a(g)(2)(v). As the FISA Court of Review found in the context of the PAA, the "stated purpose" of the collection "centers on garnering foreign intelligence" and "[t]here is no indication that the collections of information are primarily related to ordinary criminal-law enforcement purposes." In re Directives, 551 F.3d at 1011. The FISA Court of Review's analysis under the PAA in In re Directives applies equally to this case, where the Section 702

collection concerned extraterritorial, international terrorism. The government's programmatic purpose in obtaining foreign-intelligence information clearly goes beyond routine law enforcement. <u>See</u> <u>In re Sealed Case</u>, 310 F.3d at 746 ("FISA's general programmatic purpose, to protect the nation against terrorists and espionage threats directed by foreign powers, has from its outset been distinguishable from 'ordinary crime control.'"). Section 702 squarely thus falls within this purview.

        d.    A Warrant or Probable Cause
              Requirement to Collect Foreign
              Intelligence Information Would
              <u>be Impracticable</u>

The FISA Court of Review also has found with respect to PAA collection that "there is a high degree of probability that requiring a warrant would hinder the government's ability to collect time-sensitive information and, thus, would impede the vital national security interests that are at stake." <u>In re Directives</u>, 551 F.3d at 1011 (citing <u>Truong Dinh Hung</u>, 629 F.2d at 915). The Fourth Circuit has similarly acknowledged that

> attempts to counter foreign threats to the national security require the utmost stealth, speed, and secrecy. A warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign intelligence threats, and increase the chance of leaks regarding sensitive executive operations.

Truong Dinh Hung, 629 F.2d at 913. Moreover, the government's need to collect and act upon foreign-intelligence information can exist even before the government has obtained information establishing probable cause that a crime under United States law has been or will be committed. Such considerations relevant to foreign-intelligence surveillance make a warrant requirement particularly inapt in this context.

Where, as here, the government has reason to believe that a foreign person is involved with international terrorism, a warrant requirement could prevent the government from timely obtaining significant, actionable information. Even in circumstances where the government could ultimately succeed in establishing probable cause under FISA, obtaining such approval from the FISC could still result in delays that would substantially hinder the government's ability to monitor fast-moving threats. See In re Directives, 551 F.3d at 1011-12 (observing that "[c]ompulsory compliance with the warrant requirement would introduce an element of delay, thus frustrating the government's ability to collect information in a timely manner"); PCLOB Report at 104-06 (recognizing value in the "flexibility" that Section 702 "enables" by "allowing the government to quickly begin monitoring new targets and communications facilities without the delay occasioned by the requirement to secure approval from the FISA

court for each targeting decision"); cf. Verdugo-Urquidez, 494 U.S. at 273-74 ("Application of the Fourth Amendment" to aliens abroad could "significantly disrupt the ability of the political braches to respond to foreign situations involving our national interest."); Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 623 (1989) (upholding warrantless search in part because "the delay necessary to procure a warrant ... may result in the destruction of valuable evidence").

Indeed, changes in technology and the manner of collecting foreign-intelligence information, as well as the shifting threat and communications methods employed by transnational terrorist groups, make it impracticable for the government to obtain traditional warrants or FISC orders for the acquisitions currently authorized under Section 702. Congress accordingly enacted the FAA in part because the burden of preparing individualized FISA applications was impeding the government's ability to collect foreign intelligence information from foreign targets. See 154 Cong. Rec S6097, S6122 (June 25, 2008) (statement of Sen. Chambliss) ("[T]he FAA will fill the gaps identified by our intelligence officials and provide them with the tools and flexibility they need to collect intelligence from targets overseas.").

In sum, a warrant requirement to conduct surveillance under Section 702 would significantly undermine the government's ability to timely obtain foreign-intelligence information vital to national security. See Bin Laden, 126 F. Supp. 2d at 273 ("[T]he imposition of a warrant requirement [would] be a disproportionate and perhaps even disabling burden" on the government's ability to obtain foreign intelligence information); see also United States v. Abu-Jihaad, 630 F.3d 102, 121-22 (2d Cir. 2010) ("[T[he Constitution's warrant requirement is flexible, so that different standards may be compatible with the Fourth Amendment in light of the different purposes and practical considerations at issue.") (internal quotation marks and citation omitted). The Fourth Amendment is flexible enough to permit the surveillance of foreign persons located in foreign countries for foreign-intelligence purposes under Section 702 without imposing a warrant requirement, even though it is foreseeable that some communications of U.S. persons may be collected.

B.    Section 702 Is Constitutional Under
      the Fourth Amendment's Reasonableness Test

The absence of a warrant requirement in this context does not fully resolve the Fourth Amendment inquiry. In circumstances where a warrant is not required, searches and seizures are generally subject to the Fourth Amendment's

traditional standards of reasonableness.  As the Supreme Court has explained:

> Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution.  Urgent government interests are not a license for indiscriminate police behavior.  To say that no warrant is required is merely to acknowledge that rather than employing a per se rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.  This application of traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy.

Maryland v. King, 569 U.S. 435, 448 (2013) (quotation marks and internal citations omitted).  The government accepts that Section 702 collection targeting a non-U.S. person abroad that incidentally collects communications of a U.S. person must be reasonable to survive Fourth Amendment scrutiny.

Courts evaluate the reasonableness of a search by balancing the relevant interests in light of the totality of the circumstances.  See Samson, 547 U.S. at 848.  Under the general reasonableness balancing test, warrantless searches are likely to be permissible where the government need is especially strong or likely to be frustrated by the warrant requirement, where the search involves modest intrusions on individual privacy, and when safeguards restrain the government within reasonable limits.  See

Illinois v. McArthur, 531 U.S. 326, 330-31 (2001) ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.").

This Court has applied such a balancing test in upholding electronic surveillance of a U.S. person abroad who was associated with al Qaeda. See In re Terrorist Bombings, 552 F.3d at 175-76. There, the Court recognized that "complex, wide-ranging, and decentralized organizations ... warrant sustained and intense monitoring in order to understand their features and identify their members." Id. at 175. This Court also observed that "members of covert terrorist organizations, as with other sophisticated criminal enterprises, often communicate in code, or at least through ambiguous language. Hence, more extensive and careful monitoring of these communications may be necessary." Id. at 176 (citations omitted). This Court thus found, under the totality of circumstances, that the prolonged year-long electronic surveillance directly targeting a U.S. person abroad, who was a suspected al Qaeda associate, was reasonable under the Fourth Amendment. See id. The Court explained that, even though the intrusion of the targeted U.S. person's privacy was "great," the national security interest in conducting the surveillance of his

home and cellular telephone numbers was "even greater." Id.; see id. at 174. Such reasoning applies even more strongly here, where Section 702 surveillance targets foreign persons abroad.

In addition, the FISA Court of Review has applied the general reasonableness test in considering the reasonableness of the predecessor to the statute at issue here. In In re Directives, a third party brought an as-applied constitutional challenge to the PAA after having been directed by the government to assist in effectuating surveillance under that statute. See 551 F.3d at 1012-15. Notably, the PAA was broader than Section 702 in that it authorized surveillance concerning "persons reasonably believed to be outside the United States" without distinguishing between U.S. and non-U.S. persons. See id. at 1007. In finding PAA surveillance reasonable, the FISA Court of Review recognized that the government's interest in national security was of such a "high[] order of magnitude" that it justified significant intrusions on individual privacy. Id. at 1012. In addition, the court noted that PAA surveillance included a "matrix of safeguards," id. at 1013, including "effective minimization procedures" that were "almost identical to those used under FISA to ensure the curtailment of both mistaken and incidental acquisitions," id. at 1015, as well as "targeting procedures" that included "provisions designed to prevent errors" and provided for

Executive Branch and Congressional oversight of "compliance with the targeting procedures," id. The same reasoning applies to the Section 702 surveillance conducted here under the FAA.

The FAA provisions, certifications and procedures at issue in this case are at least as protective as those in the PAA. Indeed, the FAA requires a prior finding by the FISC that the targeting and minimization procedures are reasonable under the Fourth Amendment.[22] See 50 U.S.C. § 1881a(i). The FAA, unlike the PAA, also expressly prohibits "reverse targeting" of U.S. persons or the targeting of persons "known at the time of the acquisition to be located in the United States." 50 U.S.C. §§ 1881a(b)(1) and (2). Thus, the FAA stands on even firmer constitutional footing than its predecessor statute, and the FISA Court of Review's reasoning is even more persuasive here.

Finally, the Ninth Circuit has held in similar circumstances that the Section 702 collection in that case was

---

[22] The FISC repeatedly has reviewed the targeting and minimization procedures controlling the government's acquisition of foreign intelligence information under Section 702 of FISA and found that those procedures satisfy the Fourth Amendment's reasonableness standard. See, e.g., Caption Redacted, 2011 WL 10945618, at *6. The district court was similarly satisfied in this case, and the Ninth Circuit reached the same conclusion in Mohamud. Mohamud, 843 F.3d at 444 ("Although we do not place great weight on the oversight procedures, under the totality of circumstances, we conclude that the applied targeting and minimization procedures adequately protected [the defendant's] diminished privacy interest, in light of the government's compelling interest in national security.")

"reasonable" in light of the "totality of the circumstances" under the Fourth Amendment's balancing test.  See Mohamud, 843 F.3d at 441-44.  The court explained that the government's "interest in combating terrorism is an urgent objective of the highest order," while the defendant's countervailing privacy interest was diminished "at least somewhat" because "the communications at issue here had been sent" to a third-party foreign national located abroad.  Id. at 441-42.  The court further held, based on its review of the classified record, that the FISC-approved targeting and minimization procedures "sufficiently protected [the defendant's] privacy interest."  Id. at 443.

1.  Collection Under Section 702 Advances
    the Government's Compelling Interest
    in Obtaining Foreign Intelligence
    Information to Protect National Security

The government's national security interest in conducting surveillance under Section 702 "is of the highest order of magnitude."  In re Directives, 551 F.3d at 1012.  The threat of international terrorism is among "the most serious threat[s] our country faces."  In re Sealed Case, 310 F.3d at 746.  Courts thus have recognized that the government's compelling interest in collecting foreign-intelligence information to protect the nation against terrorist groups and other foreign threats may outweigh individual privacy interests.  See, e.g., In re Terrorist Bombings, 552 F.3d at 175; Cassidy, 471 F.3d at 82.  The collection

authorized by Section 702 is critical to the government's efforts against the threat of international terrorism. The National Security Agency has identified Section 702 as "the most significant tool in the NSA arsenal for the detection, identification, and disruption of terrorist threats to the U.S. and around the world." See National Security Agency, The National Security Agency: Missions, Authorities, Oversight and Partnerships 4 (August 9, 2013), available at https://www.nsa.gov/news-features/press-room/statements/2013-08-09-the-nsa-story.shtml (noting that 702 surveillance helped prevent an attack on the New York City subway system).

In addition, the Privacy and Civil Liberties Oversight Board, upon which Hasbajrami and the amici heavily rely, expressly found that Section 702 surveillance has "proven valuable in a number of ways to the government's efforts to combat terrorism." PCLOB Report at 107. The PCLOB noted that "over a quarter of the NSA's reports concerning international terrorism include information based in whole or in part on Section 702 collection" and that Section 702 is a uniquely valuable tool in enabling the government to discover and monitor terrorist networks despite the terrorists' efforts to conceal their activities and communications. Id. at 104-08. This case provides yet another instance of Section 702 collection contributing to the disruption

of a terrorist act; while Hasbajrami was successfully able to send multiple wire transfers overseas for the purpose of supporting terrorism, he was prevented from joining a terrorist group, where his knowledge of New York City and his various personal and professional capabilities (he was an architect) could have assisted that group.  There can be little doubt that 702 collection serves a compelling government interest.  See Mohamud, 843 F.3d at 441; (A 86) ("The 702 surveillance at issue here furthered an indisputably compelling government interest.").

> 2.  Persons in the United States Have a Lesser Expectation of Privacy in their Communications with Non-U.S. Persons Located Outside of the United States

The other side of the Fourth Amendment reasonableness balance is the degree to which the search "intrudes upon an individual's privacy."  Knights, 534 U.S. at 118-19.  In the context of incidental collection, U.S. persons generally have reduced expectations of privacy in information contained within communications that are collected pursuant to surveillance targeting foreigners abroad.  (See A 87) (finding that Hasbajrami had a "diminished" but "not nonexistent" privacy interest in emails that "had in fact been sent" to foreign persons abroad and collected pursuant to 702 collection targeting those persons); Mohamud, 843 F.3d at 442 (same).  Here, Hasbajrami had no cognizable Fourth Amendment interest in the email accounts used by

the foreign targets of the 702 collection, and he had no control over his own emails with those targets once they were sent. Moreover, only a subset of Hasbajrami's emails — the ones exchanged with the foreign targets — were incidentally collected under Section 702. Those factors meaningfully diminish any reasonable expectation of privacy that Hasbajrami had in the email communications relevant here.

Even if Hasbajrami's privacy interest in those emails were unaffected by transmitting them to foreign targets overseas, the surveillance in this case would still be reasonable. In this context, the government's countervailing, and compelling, interest and the relevant framework of specific procedures and safeguards designed to minimize the intrusion on privacy of U.S. persons render such collection that incidentally acquires the communications of a U.S. persons constitutionally reasonable. See In re Directives, 551 F.3d at 1012 (recognizing that the government's national security interest in conducting the surveillance authorized by Section 1881a's predecessor was of such a "high[] order of magnitude" that it would justify significant intrusions on individual privacy).

       3.   The Privacy Interests of U.S. Persons
            Are Protected by Stringent Safeguards
            and Procedures

a. The government employs multiple safeguards to ensure that Section 702 surveillance is targeted at non-U.S. persons located outside the United States for foreign intelligence purposes and to protect the privacy interests of U.S. persons whose communications are incidentally collected.

Certification. Among its protections, Section 702 requires that the DNI and the Attorney General certify that procedures are in place to protect the privacy of U.S. persons as well as non-U.S. persons located inside the United States through the use of specific targeting and minimization procedures. See 50 U.S.C. § 1881a(a),(g), and (i). In addition, the DNI and the Attorney General must also certify that a significant purpose of the acquisition is to obtain foreign intelligence information, that guidelines have been adopted to ensure compliance with the limitations in Section 702(b), and that the guidelines, targeting and minimization procedures adopted by the government are consistent with the Fourth Amendment. See 50 U.S.C. § 1881a(g)(2)(A). These requirements constitute a meaningful "internal check" on the surveillance activities of the Executive Branch. Cf. In re Sealed Case, 310 F.3d at 739 (noting that "FISA provides additional protections to ensure that only pertinent

information is sought."). In requiring such high-level officials within the Executive Branch to oversee collection under 702, the statute in no way authorizes the type of free-wheeling surveillance activity at the heart of the amici's concerns.

FISC Review. Moreover, under Section 702, the government's certification, targeting procedures, and minimization procedures are all subject to FISC review. Section 702 requires the FISC to approve a certification if the court finds that it contains all the required elements and that the targeting and minimization procedures are consistent with 50 U.S.C. § 1881a(d) and (e) and with the Fourth Amendment. See 50 U.S.C. § 1881a(i)(3)(A). Prior FISC approval, and in particular the required judicial finding that the government's targeting and minimization procedures are consistent with the Fourth Amendment, further supports the conclusion that Section 702 collection conducted pursuant to such procedures is constitutional. See Clapper, 133 S. Ct. at 1150 (noting the importance of the requirement that the FISC "assess whether the Government's targeting and minimization procedures comport with the Fourth Amendment").

The FISC's declassified opinions make clear that the FISC subjects those procedures to exacting scrutiny. See, e.g., In re DNI/AG Certification, No. 702(i)-08-01, Mem. Op. at 32–40;

[Caption Redacted], 2011 WL 10945618 (FISC Oct. 3, 2011). In addition, "FISC review of targeting and minimization procedures under Section 702 is not confined to the procedures as written; rather the Court also examines how the procedures have been and will be implemented." [Caption Redacted], Mem. Op. at 3 (FISC Aug. 26, 2014); see also id. at 25 ("[T]he FISC has a continuing role in determining and enforcing compliance with these procedures.").[23]

Hasbajrami relies on a recently released FISC opinion that, he claims, supports his argument that the procedures and oversight governing Section 702 collection provide no meaningful protection for U.S. persons' privacy interests. (HBr. 58, 64-65, 115) (citing [Case Name Redacted], Docket No. [redacted] (FISC Apr. 26, 2017).[24] In that opinion, the FISC concluded that the proposed Section 702 certifications were consistent with the statutory requirements and the Fourth Amendment. In making that determination, the FISC reviewed several specific compliance issues related to upstream collection, which is not at issue in this case. Moreover, the FISC ultimately concluded that the

---

[23] Available at <https://www.dni.gov/files/documents/0928/FISC%20Memorandum%20Opinion%20and%20Order%2026%20August%202014.pdf>

[24] Available at <https://www.dni.gov/files/documents/icotr/51117/2016_Cert_FISC_Memo_Opin_Order_Apr_2017.pdf>.

Section 702 procedures (as amended) were consistent with the statute and the Fourth Amendment, based "in large measure on the extensive oversight conducted within the implementing agencies." Id. at 67. The FISC opinion thus provides no support for Hasbajrami's challenge to the collection in this case. To the contrary, the FISC's careful review and ultimate conclusion that collection under the proposed certifications was lawful underscore the overall reasonableness of the Section 702 program in light of rigorous and effective oversight within the Executive Branch and by the FISC.

Targeting procedures. Section 702 specifically provides that targeting procedures must be "reasonably designed" to "ensure that any acquisition authorized under [the certification] is limited to targeted persons reasonably believed to be located outside the United States" and to "prevent the intentional acquisition of any communication as to which the sender and all intended recipient are known at the time of the acquisition to be located in the United States." 50 U.S.C. § 1881a(d)(1). The FISC repeatedly has found that the targeting procedures actually employed by the government meet that standard, as did the district court in this case:

> [T]he government collected emails to or from unique email addresses because it reasonably believed the owners of those email addresses were non-U.S. persons outside the United

> States, and that the collection would lead to the acquisition of foreign intelligence information. This cannot be characterized as an unreasonably broad form of interception. To the contrary, these FISC-approved targeting procedures were employed — and worked — exactly as they were intended to.

(A 90); see also Mohamud, 843 F.3d at 443.

Minimization procedures. The government also employs minimization procedures, as defined in FISA, to limit the acquisition, retention, and dissemination of information concerning U.S. persons, consistent with the government's foreign intelligence needs.[25] See 50 U.S.C. § 1801(h)(1); PCLOB Report at 50 ("Minimization procedures are best understood as a set of controls on data to balance privacy and national security interests"). Section 702 further requires that the FISC review those procedures and determine that acquisitions in accordance with such procedures are consistent with the statute and the Fourth Amendment. See 50 U.S.C. § 1881a(i)(1) and (2). All Section 702-acquired information is subject to the FISC-approved minimization procedures.

---

[25] Declassified minimization procedures used by the NSA, FBI, and CIA are available on the DNI's website at http://icontherecord.tumblr.com/post/130138039058/statement-by-the-office-of-the-director-of. The specific minimization procedures governing the Section 702 collection in this case are available in the classified record.

Minimization procedures limit how long information concerning U.S. persons can be retained and how it can be disseminated. The procedures require, among other things, that the identity of U.S. persons be redacted from intelligence reports prior to dissemination unless the information constitutes foreign intelligence information, is necessary to understand foreign intelligence information, or is evidence of a crime. See PCLOB Report at 64–65. As the FISC has held, the minimization procedures ensure that any intrusion on the privacy of U.S. persons is reasonably balanced against the government's intelligence needs. See In re DNI/AG Certification, No. 702(i)-08-01, Mem. Op. at 40.

Procedures governing Section 702 collection generally parallel procedures employed for FISA Title I and III collection, as well as the PAA procedures. The FISA Court of Review has found that these procedures sufficiently protect the privacy interests of U.S. persons whose communications are incidentally acquired and that such procedures are an important factor in upholding the constitutional reasonableness of traditional FISA surveillance and the PAA. In re Sealed Case, 310 F.3d at 740–41; see In re Directives, 551 F.3d at 1015 (finding it "significant" that "effective minimization procedures are in place" to "serve as an additional backstop against identification errors as well as a

means of reducing the impact of incidental intrusions into the privacy of non-targeted United States persons.").

The FISC has authority to supervise the government's compliance with minimization procedures. Section 702's oversight provisions require regular reporting to the FISC concerning the government's implementation of minimization procedures. See 50 U.S.C. § 1881a(l). In addition, Rule 13(b) of the FISC's Rules of Procedure requires the government to report, in writing, all instances of non-compliance. In response to such reports, the FISC has authority to disapprove or to require amendments to the minimization procedures, as, indeed, the FISC has done.[26]

As with the targeting procedures, the district court found that the minimization procedures implemented in Hasbajrami's case contributed to the protections he enjoyed as a U.S. person:

> [B]efore approving the surveillance, the FISC
> found that the targeting and minimization
> procedures in the government's Section 702
> applications were consistent with and
> reasonable under the Fourth Amendment. . . .

---

[26] In [Caption Redacted], 2011 WL 10945618, at *1 (FISC Oct. 3, 2011), the FISC found that the government's minimization procedures, as applied to certain electronic communications acquired at "upstream" points on the internet backbone networks, did not comply with Section 702 or the Constitution, due to technical limits on the government's ability to isolate targeted communications that were transmitted as part of a multi-communication batch. The government revised its procedures, and the FISC held the amended procedures were consistent with the statute and the Fourth Amendment. [Caption Redacted], 2011 WL 10947772, at *1 (FISC Nov. 30, 2011). However, as noted earlier, upstream surveillance is not at issue in this case.

> All of these procedures help limit the scope of Section 702 surveillance, and thus support the reasonableness of that surveillance under the Fourth Amendment. . . . The stringent safeguards embodied in the FAA, i.e., its targeting and minimization procedures, ensured that only the communications of non-U.S. persons abroad were collected. And the targeting that took place in this case was as particular as it gets—the FISC approved the targeting of specific non-U.S. persons outside the United States for specific counter-terrorism purposes. The incidental interception of Hasbajrami's emails as a consequence of that lawful surveillance does not alter the reasonableness of the interception.

(A 91); see also Mohamud, 843 F.3d at 444 ("Based on our review of the classified record, we agree that the applicable targeting and minimization procedures, which were followed in practice, sufficiently protected Mohamud's privacy interest."). Other courts have also found minimization procedures to be relevant to upholding traditional FISA surveillance for similar reasons. See, e.g., In re Sealed Case, 310 F.3d at 740-42.

b. Hasbajrami argues that the minimization procedures are inadequate because, he claims, they permit the government to use Section 1881a as a pretextual "back door" tool to amass a database of Americans' communications and query it using identities of U.S. persons for purposes unrelated to the foreign intelligence purpose of the collection. (See, e.g., HBr. 48-49, 57). Contrary to Hasbajrami's argument, the statute prohibits pretextual targeting of a person abroad if the purpose is to target

a U.S. person or a person in the United States. See 50 U.S.C. § 1881a(b)(2). In addition, Hasbajrami's argument depends on the erroneous premise that the government may not permissibly review communications it has lawfully obtained under Section 702 when they include incidentally-collected communications of U.S. persons. Hasbajrami cites no authority supporting his contention that the government's review of communications lawfully acquired through foreign-intelligence surveillance targeted at non-U.S. persons abroad triggers additional Fourth Amendment process where, as here, that surveillance is conducted pursuant to reasonable statutory safeguards. (See A 90 n.20) (agreeing with the government that "[i]t would be perverse to authorize the unrestricted review of lawfully collected information but then [] restrict the targeted review of the same information in response to tailored inquiries"). In addition, the FISC has repeatedly addressed the minimization rules governing the querying of Section 702 data and has found that those rules satisfy statutory and constitutional requirements. See, e.g., [Caption Redacted], Memo. Op. 33-44 (FISC Nov. 6, 2015).[27]

In any event, this Court's reasonableness analysis should focus on the way the government used the Section 702

---

[27] Available at https://www.dni.gov/files/documents/20151106-702Mem_Opinion_Order_for_Public_Release.pdf.

information at issue in this case, especially since Hasbajrami has raised an as-applied challenge to the statute. See Mohamud, 843 F.3d at 438 n.21 (explaining that a court may not "suppress evidence based on a Fourth Amendment challenge to techniques not employed in a particular case"). As the district court found, and as this Court's review of the classified record will show, the government's use of Section 702 authority in this case was reasonable and appropriate and fully compliant with the governing statute and procedures. As the district court explained, "once the government learned [through information obtained through Section 702] that [a person] was potentially an agent of a foreign power," the government submitted that information to the FISC to obtain "orders from the FISC for electronic surveillance and physical searches pursuant to Title I and Title III of FISA targeting [that person]." (A 90 n.20). The government's use of Section 702 information in this way was fully consistent with the Fourth Amendment.

4. Collection Under 702 Has Sufficient Particularity

Hasbajrami argues that collection pursuant to Section 702 fails the Fourth Amendment's general reasonableness test because it does not require a particularized court order or finding of probable cause, as in traditional FISA collection or domestic law enforcement wiretaps under Title III. (See, e.g., HBr. 5-7).

Section 702 does rely, however, on specific, individualized targeting decisions pursuant to FISC-approved procedures that require the government to determine (1) that the particular "user of the facility to be tasked for collection is a non-United States person reasonably believed to be located outside the United States," Caption Redacted, 2011 WL 10945618, at *7, and (2) the collection is designed to obtain foreign intelligence information within the scope of the certification approved by the court. Thus, as the PCLOB noted, the government must determine that a specific non-U.S. person located outside the United States is likely to communicate certain types of foreign intelligence information and that the person uses a specific communications "selector," such as an email address, and the government acquires only communications involving that particular selector. PCLOB Report at 20-23, 32-33, 111-12. Although particularity may be considered as one factor among many in assessing the reasonableness of a search, the Fourth Amendment "imposes no irreducible requirement" of individualized suspicion where the search is otherwise reasonable. King, 569 U.S. 447 (citation omitted). While the number of communications intercepted by the government could be voluminous, the collection is neither indiscriminate nor untethered to a vital national security interest. Rather, Section 702's targeting procedures are sufficiently particularized for the purpose of the collection, and

are thus reasonable under the Fourth Amendment. Indeed, with respect to this case, the Section 702 collection at issue reasonably targeted particular foreign persons abroad in connection with matters involving international terrorism. (See A 91) (finding that the collection in this case "was as particular as it gets" because it involved "the targeting of specific non-U.S. persons outside the United States for specific counterterrorism purposes").

C.   The Good Faith Exception to the
     Exclusionary Rule Applies in this Case

Finally, even putting aside the Fourth Amendment arguments set forth above, the good-faith exception to the exclusionary rule provides an independent basis to uphold the searches conducted in Hasbajrami's case. See United States v. Leon, 468 U.S. 897, 913 (1984); see also Davis v. United States, 564 U.S. 229, 236-39 (2011); Herring v. United States, 555 U.S. 135, 140-44 (2009). The good-faith rule applies, among other times, when law enforcement agents act in "objectively reasonable reliance on a statute." Illinois v. Krull, 480 U.S. 340, 349-50 (1987). The good-faith exception applies here because government agents relied on the fruits of surveillance that was conducted pursuant to the FAA, consistent with the targeting and minimization

procedures approved by the FISC, which was objectively reasonable under the circumstances.[28]

---

[28] In addition to his Fourth Amendment claims, Hasbajrami raises a passing challenge to the constitutionality of Section 702 under separation-of-powers principles. Specifically, he argues that, because the FISC reviews the government's certifications under Section 702, the court's role in the surveillance is an impermissible encroachment on the separation between the judicial and executive branches of government. (HBr. 76). The Ninth Circuit in Mohamud properly rejected a similar argument. See Mohamud, 843 F.3d at 444 n.28 (holding that the FISC's role in reviewing Section 702 certifications is consistent with separation of powers because it "does not interfere with the prerogatives of another branch of government beyond requiring the executive branch to conform to the statute, and is central to the mission of the judiciary as it is similar to the review of search warrants and wiretap applications") (citing Mistretta v. United States, 488 U.S. 361, 388 (1989)) (internal quotation marks omitted). And even if the FISC's role were somehow improper, Hasbajrami has not explained how the FISC's participation violated his rights or would provide a basis for excluding evidence. See Mohamud, Cr. No. 3:10-CR-00475-KI-1, 2014 WL 2866749 at *11 ("FISC review of § 702 surveillance submissions provides prior review by a neutral and detached magistrate [which] strengthens, not undermines, Fourth Amendment rights.").

POINT TWO

THE GOVERNMENT COMPLIED WITH THE
STATUTORY REQUIREMENTS IN THIS CASE

I.    The Section 702 Collection in this Case
      Targeted a Foreign Person in a Foreign
      Country for a Foreign Intelligence Purpose

In Point II of his brief, Hasbajrami argues that the government violated the terms of Section 702 (50 U.S.C. § 1881a) in its implementation of Section 702 surveillance in this case. Hasbajrami is mistaken.  As the district court found after reviewing the government's classified submissions in both the CIPA and FISA suppression context, the government complied with the requirements of the FAA in conducting 702 surveillance, as well as in the Title I and Title III FISA surveillance that was derived from that surveillance.

As Judge Gleeson explained in his opinion, the certifications approved by the FISC "contained the elements required by Section 702, and ... the targeting and minimization procedures were consistent with the Fourth Amendment."  (A 88). The district court found that the government properly targeted "specific non-U.S. persons outside the United States for specific counterterrorism purposes," and thus "the targeting that took place in this case was as particular as it gets."  (A 91). Moreover, the government properly used the minimization procedures

to help "limit the acquisition, retention, and dissemination of information concerning U.S. persons under Section 702."  (A 90).

With respect to the Title I and Title III FISA surveillance, the district court thoroughly explained its decision in terms that require little further elaboration:

> I find that the government's detailed and complete submissions in this case would easily allow it to clear a higher standard of review than the deferential one that I must apply.  I have conducted a careful ex parte examination and agree that the certifications here were made in accordance with FISA's requirements and the targeting of an agent of a foreign power was not clearly erroneous.  The certifications explained that a significant purpose of the F1SA surveillance was to obtain foreign intelligence information that could not be reasonably obtained through regular investigative techniques.

> I have also examined the application materials and find that they meet the showing of probable cause required by FISA.  The government's submissions here were quite detailed and complete; they described at length the facts supporting the Government's assertion that there was probable cause to believe that the target of the FISA surveillance was an agent of a foreign power and ... that a significant purpose of the surveillance was to gather foreign intelligence information.

> Specifically, the government obtained — pursuant to Section 702 surveillance — many email communications between Hasbajrami and non-U.S. persons reasonably believed to be located outside the United States who were [REDACTED TEXT].  The government described these emails in its Title I and Title III FISA applications targeting an agent of a foreign power, and they supported the FISC's finding

of probable cause that the target was an agent of a foreign power. In addition, I find that the target is described with particularity, as is the basis for believing that the facilities at which electronic surveillance would occur was being used, or about to be used, by the target and that the premises or property to be searched contained foreign intelligence information that was owned, used, possessed by, or in transit to or from the target. The exhaustive submissions I have received in connection with the application provided ample support for my finding that the government met its probable cause requirement.

Lastly, the FISA collection of Hasbajrami's communications adhered to the approved minimization procedures. The test of compliance in the context of FISA surveillance is whether the government attempted a good faith effort to minimize" the interception of innocent conversations. The government made that effort here. In addition to numerous other steps, only authorized personnel were able to review the information acquired, and the identities of U.S. persons were minimized before the communications were disseminated by the FBI to other agencies.

Based on this information, the government lawfully conducted the FISA surveillance at issue.

(A 92-93) (quotation marks, alterations and citations omitted).

The classified materials upon which the district court relied in making this determination are available to this Court. These classified materials are not available to Hasbajrami, and in that lies the heart of his complaint. (HBr. 73) ("FISA and Section 702 applications (and supporting documents) have never been shared with the defendant or defense counsel"). Dissatisfied with the

assurances provided by the district court, Hasbajrami asserts that the determination of "whether the Government adhered to the restrictions set forth in 50 U.S.C. § 1881a" is "entirely one-sided." (HBr. 74). But this assertion is belied by the fact that the district court conducted an "exhaustive" review of classified materials, which included multiple classified hearings. (A 92-93). The district court hardly relied on the government's assertions alone in satisfying itself that the government complied with the requirements of the FAA and FISA.

II. Ex Parte Review of Foreign
    Intelligence Surveillance Is Appropriate

Incorporating the judicial review provisions of FISA, the FAA expressly provides that, if the Attorney General files a declaration stating that "disclosure or an adversary hearing would harm the national security of the United States," as in this case, the district court must review the relevant materials ex parte and in camera, and may order disclosure thereafter only where necessary to make an accurate determination of the legality of the surveillance. 50 U.S.C § 1806(f); see also id. § 1881e(a). As Judge Gleeson observed, "A court may disclose to a defendant 'under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.'"

(A 94) (citing 50 U.S.C. § 1806(f)). "But where a court 'determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure.'" (Id.) (citing 50 U.S.C. § 1806(f)).

In the FISA context, this Court has concluded that disclosure of such materials "is the exception and ex parte, in camera determination is the rule." See United States v. Stewart, 590 F.3d 93, 129 (2d Cir. 2009); see also Abu-Jihaad, 630 F.3d at 129; United States v. Daoud, 755 F.3d 479, 481-82 (7th Cir.), supplemented, 761 F.3d 678 (7th Cir. 2014). Here, the district court correctly found that "[t]he same ex parte, in camera procedure applies to discovery motions related to Section 702." (A 94) (citing 50 U.S.C. § 1881e(a)). Cognizant of its authority to disclose such materials, the district court concluded that "[a]fter careful review of the FISA and Section 702 materials here it is clear to me that disclosure was unnecessary here." (A 94).

While it is understandable that Hasbajrami would wish to review the sensitive, classified materials underlying some of the collection in his case, as this Court has noted, ex parte and in camera review of such materials is appropriate under the statute. In Stewart, this Court "agree[d] with the district court's treatment of confidential information, including its denial of

[the defendant's] motion to suppress evidence obtained pursuant to [FISA], its <u>ex</u> <u>parte</u>, <u>in</u> <u>camera</u> examination of FISA wiretap applications, and its rejection of [the defendant's] more general challenges to the constitutionality of FISA." <u>Stewart</u>, 590 F.3d at 99. This Court similarly found "no fault with the district court's treatment, in accordance with [CIPA], of [the defendant's] motion to compel disclosure of information related to potential surveillance conducted by the National Security Agency." <u>Id.</u> The same reasoning applies to the district court's handling of the classified information at issue here. As the district court concluded:

> My review of the materials was relatively straightforward and not complex, and I was able to evaluate the legality of the challenged surveillance without concluding that due process first warranted disclosure. Specifically, the foreign intelligence information obtained pursuant to the FISA and FAA surveillance and searches was lawfully acquired because the collection of foreign intelligence pursuant to Section 702's PRISM program complies with the Fourth Amendment, and because the government complied with the relevant statutory directives. Given this determination, disclosure of the materials to the defendant is unnecessary.

(A 94) (citing <u>Abu-Jihaad</u>, 630 F.3d at 129).

The FAA reasonably provides for <u>ex</u> <u>parte</u> review of classified information. As the Seventh Circuit has explained in the FISA context, "the judge appears to have believed that adversary procedure is always essential to resolve contested

issues of fact. That is an incomplete description of the American judicial system in general and the federal judicial system in particular." Daoud, 755 F.3d at 482. This is so even in light of the general preference for adversary proceedings, and especially so where national security interests are at stake. See id. at 483 ("Everyone recognizes that privacy is a legally protectable interest, and it is not an interest of private individuals alone. The Foreign Intelligence Surveillance Act is an attempt to strike a balance between the interest in full openness of legal proceedings and the interest in national security, which requires a degree of secrecy concerning the government's efforts to protect the nation."). It is of no import that defense counsel here possess security clearances if they do not also possess the requisite need to know classified information. See id. at 484 ("So in addition to having the requisite clearance the seeker must convince the holder of the information of the seeker's need to know it. If the district judge's threshold inquiry into whether [the defendant's] lawyers needed any of the surveillance materials revealed that they didn't, their security clearances would not entitle them to any of those materials."). Thus, because the district court found that its review of underlying classified materials was "straightforward," there was no necessity to

disclose any of these materials to defense counsel or the defendant.

POINT THREE

## THE REDACTIONS IN THE DISTRICT COURT'S OPINION DID NOT VIOLATE HASBAJRAMI'S DUE PROCESS RIGHTS

I.  The District Court Made Minor
    Modifications to Its Initial Opinion

As Judge Gleeson noted on the docket sheet, with respect to his initial memorandum and order denying Hasbajrami's motion to suppress

> There are several instances in this memorandum where language has been substituted, and two instances where language has been redacted, from that in the presumptively classified opinion given to the classified information security officer on February 18, 2016. These substitutions and redactions reflect the government's decision that the material redacted would "expose government equities."

(DE 165).  Hasbajrami's reliance on United States v. Moussaoui, 382 F.3d 453 (4th Cir. 2004), to attempt to establish a due process violation on these facts is misplaced.  In that case, the Fourth Circuit held that substitutions for classified information did not per se violate the defendant's due process rights, and observed that "due process [] is ultimately a matter of providing an opportunity to have one's claim resolved in a meaningful manner, and does not guarantee that such claim will be presented in the most effective manner."  Id. at 477 (quoting Ball v. Woods, 402 F. Supp. 803, 810 (N.D. Ala. 1975)).

As an initial matter, it is not surprising that a district court would include in its memorandum information it considered in deciding a motion to suppress. However, in the absence of a finding that disclosure is necessary for an accurate determination of the legality of surveillance, the statute prohibits disclosure of classified FISA materials. See 50 U.S.C. § 1806(f). Because the district court determined that such disclosure was not necessary, it was reasonable for the court to redact portions of two sentences in its opinion (see A 89-90, 92) and to substitute other information in conformity with this principle.

## II. Chief Judge Irizarry Reviewed the Redacted Information

Above and beyond Judge Gleeson's own implicit determination that it was not necessary to disclose the redacted information to defense counsel, after Chief Judge Irizarry took over Hasbajrami's case, she twice addressed this issue, both times finding that defense counsel were not entitled to that information in the pursuit of this appeal or otherwise. In denying Hasbajrami's motion for reconsideration, Chief Judge Irizarry "determined that neither the Classified Information Procedures Act ("CIPA") nor the Foreign Intelligence Surveillance Act ("FISA") compels or allows disclosure of an unredacted copy of Judge Gleeson's opinion." (A 111). Quoting its previous order of April

6, 2017, the district court further explained that, "[u]nder FISA, this Court determined that Defendant's counsel was not entitled to an unredacted copy of Judge Gleeson's opinion because releasing it would reveal classified foreign intelligence information and circumvent FISA by undermining the purpose of section 1806(f)." (Id.). The district court further found that "FISA does not mandate disclosure in order to help defendants make an appeal." (Id.).

Chief Judge Irizarry also ruled that "CIPA does not compel or regulate the discovery of classified information contained in a court's written opinion." (A 111). The court noted that "[b]ecause Judge Gleeson conducted his review of the classified materials by relying on FISA, the Court holds that FISA determines whether or not Defendant's attorneys have a 'need-to-know' the contents of the Unredacted Opinion." (Id.). The court concluded that, "[a]pplying FISA, defense counsel do not have a 'need-to-know' the contents of the Unredacted Opinion" and found that "[t]he redacted content neither facilitates countering the government's case nor bolsters a defense." (A 111-12).

Hasbajrami acknowledges that "in the FISA context, the presumptive ex parte proceedings and submissions are grounded in statute." (HBr. 98). However, Hasbajrami fails to apprehend that the redactions to Judge Gleeson's opinion were made within that

purview and are thus entirely consistent with the "balance between the interest in full openness of legal proceedings and the interest in national security, which requires a degree of secrecy concerning the government's efforts to protect the nation." Daoud, 755 F.3d at 483. There is nothing inappropriate or unusual in a court's decision to discuss classified information in portions of a judicial opinion that are themselves classified. See, e.g., Mohamud, Cr. No. 3:10-CR-00475-KI-1, 2014 WL 2866749, at *28 ("I deny defendant's arguments concerning [50 U.S.C. § 1861] for the reasons stated in the classified opinion.").

In any event, any error in the district court's redactions of portions of its opinion would be harmless because, as this Court's review of the unredacted opinion will show, the minor redactions are not material to Hasbajrami's ability to challenge the denial of his motion to suppress.

## CONCLUSION

For the reasons stated, the judgment of the district court should be affirmed.

Dated:     Brooklyn, New York
           January 16, 2018

                              Respectfully submitted,

                              RICHARD P. DONOGHUE,
                              United States Attorney,
                              Eastern District of New York.

                   By:            /s/
                              SETH D. DUCHARME
                              Assistant U.S. Attorney


DAVID C. JAMES,
SETH D. DUCHARME,
SARITHA KOMATIREDDY,
Assistant United States Attorneys,

JOSEPH F. PALMER,
Attorney, National Security Division,
United States Department of Justice,
     (Of Counsel).

CERTIFICATE CONCERNING COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS

---

1. This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 19,671 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). However, this Court has granted the government's motion to file a brief of up to 27,000 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated: Brooklyn, New York
      January 16, 2018

             /s/
DAVID C. JAMES
Assistant U.S. Attorney

ADDENDUM

# TABLE OF CONTENTS

Page

50 U.S.C. § 1881a (FISA Section 702)..........................A01

 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated

  Title 50. War and National Defense (Refs & Annos)

    Chapter 36. Foreign Intelligence Surveillance (Refs & Annos)

      Subchapter VI. Additional Procedures Regarding Certain Persons Outside the United States

50 U.S.C.A. § 1881a

§ 1881a. Procedures for targeting certain persons outside the United States other than United States persons

Effective: June 2, 2015

Currentness

**(a) Authorization**

Notwithstanding any other provision of law, upon the issuance of an order in accordance with subsection (i)(3) or a determination under subsection (c)(2), the Attorney General and the Director of National Intelligence may authorize jointly, for a period of up to 1 year from the effective date of the authorization, the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information.

**(b) Limitations**

An acquisition authorized under subsection (a)--

**(1)** may not intentionally target any person known at the time of acquisition to be located in the United States;

**(2)** may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States;

**(3)** may not intentionally target a United States person reasonably believed to be located outside the United States;

**(4)** may not intentionally acquire any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States; and

**(5)** shall be conducted in a manner consistent with the fourth amendment to the Constitution of the United States.

**(c) Conduct of acquisition**

**(1) In general**

An acquisition authorized under subsection (a) shall be conducted only in accordance with--

**(A)** the targeting and minimization procedures adopted in accordance with subsections (d) and (e); and

**(B)** upon submission of a certification in accordance with subsection (g), such certification.

**(2) Determination**

A determination under this paragraph and for purposes of subsection (a) is a determination by the Attorney General and the Director of National Intelligence that exigent circumstances exist because, without immediate implementation of an authorization under subsection (a), intelligence important to the national security of the United States may be lost or not timely acquired and time does not permit the issuance of an order pursuant to subsection (i)(3) prior to the implementation of such authorization.

**(3) Timing of determination**

The Attorney General and the Director of National Intelligence may make the determination under paragraph (2)--

**(A)** before the submission of a certification in accordance with subsection (g); or

**(B)** by amending a certification pursuant to subsection (i)(1)(C) at any time during which judicial review under subsection (i) of such certification is pending.

**(4) Construction**

Nothing in subchapter I shall be construed to require an application for a court order under such subchapter for an acquisition that is targeted in accordance with this section at a person reasonably believed to be located outside the United States.

**(d) Targeting procedures**

**(1) Requirement to adopt**

The Attorney General, in consultation with the Director of National Intelligence, shall adopt targeting procedures that are reasonably designed to--

**(A)** ensure that any acquisition authorized under subsection (a) is limited to targeting persons reasonably believed to be located outside the United States; and

**(B)** prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States.

**(2) Judicial review**

The procedures adopted in accordance with paragraph (1) shall be subject to judicial review pursuant to subsection (i).

**(e) Minimization procedures**

**(1) Requirement to adopt**

The Attorney General, in consultation with the Director of National Intelligence, shall adopt minimization procedures that meet the definition of minimization procedures under section 1801(h) of this title or section 1821(4) of this title, as appropriate, for acquisitions authorized under subsection (a).

**(2) Judicial review**

The minimization procedures adopted in accordance with paragraph (1) shall be subject to judicial review pursuant to subsection (i).

**(f) Guidelines for compliance with limitations**

**(1) Requirement to adopt**

The Attorney General, in consultation with the Director of National Intelligence, shall adopt guidelines to ensure--

**(A)** compliance with the limitations in subsection (b); and

**(B)** that an application for a court order is filed as required by this chapter.

**(2) Submission of guidelines**

The Attorney General shall provide the guidelines adopted in accordance with paragraph (1) to--

**(A)** the congressional intelligence committees;

**(B)** the Committees on the Judiciary of the Senate and the House of Representatives; and

**(C)** the Foreign Intelligence Surveillance Court.

**(g) Certification**

**(1) In general**

**(A) Requirement**

Subject to subparagraph (B), prior to the implementation of an authorization under subsection (a), the Attorney General and the Director of National Intelligence shall provide to the Foreign Intelligence Surveillance Court a written certification and any supporting affidavit, under oath and under seal, in accordance with this subsection.

**(B) Exception**

If the Attorney General and the Director of National Intelligence make a determination under subsection (c)(2) and time does not permit the submission of a certification under this subsection prior to the implementation of an authorization

under subsection (a), the Attorney General and the Director of National Intelligence shall submit to the Court a certification for such authorization as soon as practicable but in no event later than 7 days after such determination is made.

**(2) Requirements**

A certification made under this subsection shall--

**(A)** attest that--

**(i)** there are procedures in place that have been approved, have been submitted for approval, or will be submitted with the certification for approval by the Foreign Intelligence Surveillance Court that are reasonably designed to--

**(I)** ensure that an acquisition authorized under subsection (a) is limited to targeting persons reasonably believed to be located outside the United States; and

**(II)** prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States;

**(ii)** the minimization procedures to be used with respect to such acquisition--

**(I)** meet the definition of minimization procedures under section 1801(h) or 1821(4) of this title, as appropriate; and

**(II)** have been approved, have been submitted for approval, or will be submitted with the certification for approval by the Foreign Intelligence Surveillance Court;

**(iii)** guidelines have been adopted in accordance with subsection (f) to ensure compliance with the limitations in subsection (b) and to ensure that an application for a court order is filed as required by this chapter;

**(iv)** the procedures and guidelines referred to in clauses (i), (ii), and (iii) are consistent with the requirements of the fourth amendment to the Constitution of the United States;

**(v)** a significant purpose of the acquisition is to obtain foreign intelligence information;



**(vi)** the acquisition involves obtaining foreign intelligence information from or with the assistance of an electronic communication service provider; and

**(vii)** the acquisition complies with the limitations in subsection (b);

**(B)** include the procedures adopted in accordance with subsections (d) and (e);

**(C)** be supported, as appropriate, by the affidavit of any appropriate official in the area of national security who is--

**(i)** appointed by the President, by and with the advice and consent of the Senate; or

**(ii)** the head of an element of the intelligence community;

**(D)** include--

**(i)** an effective date for the authorization that is at least 30 days after the submission of the written certification to the court; or

**(ii)** if the acquisition has begun or the effective date is less than 30 days after the submission of the written certification to the court, the date the acquisition began or the effective date for the acquisition; and

**(E)** if the Attorney General and the Director of National Intelligence make a determination under subsection (c)(2), include a statement that such determination has been made.

**(3) Change in effective date**

The Attorney General and the Director of National Intelligence may advance or delay the effective date referred to in paragraph (2)(D) by submitting an amended certification in accordance with subsection (i)(1)(C) to the Foreign Intelligence Surveillance Court for review pursuant to subsection (i).

**(4) Limitation**

A certification made under this subsection is not required to identify the specific facilities, places, premises, or property at which an acquisition authorized under subsection (a) will be directed or conducted.

**(5) Maintenance of certification**

The Attorney General or a designee of the Attorney General shall maintain a copy of a certification made under this subsection.

**(6) Review**

A certification submitted in accordance with this subsection shall be subject to judicial review pursuant to subsection (i).

**(h) Directives and judicial review of directives**

**(1) Authority**

With respect to an acquisition authorized under subsection (a), the Attorney General and the Director of National Intelligence may direct, in writing, an electronic communication service provider to--

**(A)** immediately provide the Government with all information, facilities, or assistance necessary to accomplish the acquisition in a manner that will protect the secrecy of the acquisition and produce a minimum of interference with the services that such electronic communication service provider is providing to the target of the acquisition; and

**(B)** maintain under security procedures approved by the Attorney General and the Director of National Intelligence any records concerning the acquisition or the aid furnished that such electronic communication service provider wishes to maintain.

**(2) Compensation**

The Government shall compensate, at the prevailing rate, an electronic communication service provider for providing information, facilities, or assistance in accordance with a directive issued pursuant to paragraph (1).

**(3) Release from liability**

No cause of action shall lie in any court against any electronic communication service provider for providing any information, facilities, or assistance in accordance with a directive issued pursuant to paragraph (1).

**(4) Challenging of directives**

**(A) Authority to challenge**

An electronic communication service provider receiving a directive issued pursuant to paragraph (1) may file a petition to modify or set aside such directive with the Foreign Intelligence Surveillance Court, which shall have jurisdiction to review such petition.

**(B) Assignment**

The presiding judge of the Court shall assign a petition filed under subparagraph (A) to 1 of the judges serving in the pool established under section 1803(e)(1) of this title not later than 24 hours after the filing of such petition.

**(C) Standards for review**

A judge considering a petition filed under subparagraph (A) may grant such petition only if the judge finds that the directive does not meet the requirements of this section, or is otherwise unlawful.

**(D) Procedures for initial review**

A judge shall conduct an initial review of a petition filed under subparagraph (A) not later than 5 days after being assigned such petition. If the judge determines that such petition does not consist of claims, defenses, or other legal contentions that are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law, the judge shall immediately deny such petition and affirm the directive or any part of the directive that is the subject of such petition and order the recipient to comply with the directive or any part of it. Upon making a determination under this subparagraph or promptly thereafter, the judge shall provide a written statement for the record of the reasons for such determination.

**(E) Procedures for plenary review**

If a judge determines that a petition filed under subparagraph (A) requires plenary review, the judge shall affirm, modify, or set aside the directive that is the subject of such petition not later than 30 days after being assigned such petition. If the judge does not set aside the directive, the judge shall immediately affirm or affirm with modifications the

directive, and order the recipient to comply with the directive in its entirety or as modified. The judge shall provide a written statement for the record of the reasons for a determination under this subparagraph.

### (F) Continued effect

Any directive not explicitly modified or set aside under this paragraph shall remain in full effect.

### (G) Contempt of court

Failure to obey an order issued under this paragraph may be punished by the Court as contempt of court.

## (5) Enforcement of directives

### (A) Order to compel

If an electronic communication service provider fails to comply with a directive issued pursuant to paragraph (1), the Attorney General may file a petition for an order to compel the electronic communication service provider to comply with the directive with the Foreign Intelligence Surveillance Court, which shall have jurisdiction to review such petition.

### (B) Assignment

The presiding judge of the Court shall assign a petition filed under subparagraph (A) to 1 of the judges serving in the pool established under section 1803(e)(1) of this title not later than 24 hours after the filing of such petition.

### (C) Procedures for review

A judge considering a petition filed under subparagraph (A) shall, not later than 30 days after being assigned such petition, issue an order requiring the electronic communication service provider to comply with the directive or any part of it, as issued or as modified, if the judge finds that the directive meets the requirements of this section and is otherwise lawful. The judge shall provide a written statement for the record of the reasons for a determination under this paragraph.

### (D) Contempt of Court

Failure to obey an order issued under this paragraph may be punished by the Court as contempt of court.

**(E) Process**

Any process under this paragraph may be served in any judicial district in which the electronic communication service provider may be found.

**(6) Appeal**

**(A) Appeal to the Court of Review**

The Government or an electronic communication service provider receiving a directive issued pursuant to paragraph (1) may file a petition with the Foreign Intelligence Surveillance Court of Review for review of a decision issued pursuant to paragraph (4) or (5). The Court of Review shall have jurisdiction to consider such petition and shall provide a written statement for the record of the reasons for a decision under this subparagraph.

**(B) Certiorari to the Supreme Court**

The Government or an electronic communication service provider receiving a directive issued pursuant to paragraph (1) may file a petition for a writ of certiorari for review of a decision of the Court of Review issued under subparagraph (A). The record for such review shall be transmitted under seal to the Supreme Court of the United States, which shall have jurisdiction to review such decision.

**(i) Judicial review of certifications and procedures**

**(1) In general**

**(A) Review by the Foreign Intelligence Surveillance Court**

The Foreign Intelligence Surveillance Court shall have jurisdiction to review a certification submitted in accordance with subsection (g) and the targeting and minimization procedures adopted in accordance with subsections (d) and (e), and amendments to such certification or such procedures.

**(B) Time period for review**

The Court shall review a certification submitted in accordance with subsection (g) and the targeting and minimization

procedures adopted in accordance with subsections (d) and (e) and shall complete such review and issue an order under paragraph (3) not later than 30 days after the date on which such certification and such procedures are submitted.

**(C) Amendments**

The Attorney General and the Director of National Intelligence may amend a certification submitted in accordance with subsection (g) or the targeting and minimization procedures adopted in accordance with subsections (d) and (e) as necessary at any time, including if the Court is conducting or has completed review of such certification or such procedures, and shall submit the amended certification or amended procedures to the Court not later than 7 days after amending such certification or such procedures. The Court shall review any amendment under this subparagraph under the procedures set forth in this subsection. The Attorney General and the Director of National Intelligence may authorize the use of an amended certification or amended procedures pending the Court's review of such amended certification or amended procedures.

**(2) Review**

The Court shall review the following:

**(A) Certification**

A certification submitted in accordance with subsection (g) to determine whether the certification contains all the required elements.

**(B) Targeting procedures**

The targeting procedures adopted in accordance with subsection (d) to assess whether the procedures are reasonably designed to--

**(i)** ensure that an acquisition authorized under subsection (a) is limited to targeting persons reasonably believed to be located outside the United States; and

**(ii)** prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States.

**(C) Minimization procedures**

The minimization procedures adopted in accordance with subsection (e) to assess whether such procedures meet the definition of minimization procedures under section 1801(h) of this title or section 1821(4) of this title, as appropriate.

**(3) Orders**

**(A) Approval**

If the Court finds that a certification submitted in accordance with subsection (g) contains all the required elements and that the targeting and minimization procedures adopted in accordance with subsections (d) and (e) are consistent with the requirements of those subsections and with the fourth amendment to the Constitution of the United States, the Court shall enter an order approving the certification and the use, or continued use in the case of an acquisition authorized pursuant to a determination under subsection (c)(2), of the procedures for the acquisition.

**(B) Correction of deficiencies**

If the Court finds that a certification submitted in accordance with subsection (g) does not contain all the required elements, or that the procedures adopted in accordance with subsections (d) and (e) are not consistent with the requirements of those subsections or the fourth amendment to the Constitution of the United States, the Court shall issue an order directing the Government to, at the Government's election and to the extent required by the Court's order--

**(i)** correct any deficiency identified by the Court's order not later than 30 days after the date on which the Court issues the order; or

**(ii)** cease, or not begin, the implementation of the authorization for which such certification was submitted.

**(C) Requirement for written statement**

In support of an order under this subsection, the Court shall provide, simultaneously with the order, for the record a written statement of the reasons for the order.

**(D) Limitation on use of information**

**(i) In general**

Except as provided in clause (ii), if the Court orders a correction of a deficiency in a certification or procedures under subparagraph (B), no information obtained or evidence derived pursuant to the part of the certification or procedures

that has been identified by the Court as deficient concerning any United States person shall be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in or before any court, grand jury, department, office, agency, regulatory body, legislative committee, or other authority of the United States, a State, or political subdivision thereof, and no information concerning any United States person acquired pursuant to such part of such certification or procedures shall subsequently be used or disclosed in any other manner by Federal officers or employees without the consent of the United States person, except with the approval of the Attorney General if the information indicates a threat of death or serious bodily harm to any person.

**(ii) Exception**

If the Government corrects any deficiency identified by the order of the Court under subparagraph (B), the Court may permit the use or disclosure of information obtained before the date of the correction under such minimization procedures as the Court may approve for purposes of this clause.

**(4) Appeal**

**(A) Appeal to the Court of Review**

The Government may file a petition with the Foreign Intelligence Surveillance Court of Review for review of an order under this subsection. The Court of Review shall have jurisdiction to consider such petition. For any decision under this subparagraph affirming, reversing, or modifying an order of the Foreign Intelligence Surveillance Court, the Court of Review shall provide for the record a written statement of the reasons for the decision.

**(B) Continuation of acquisition pending rehearing or appeal**

Any acquisition affected by an order under paragraph (3)(B) may continue--

**(i)** during the pendency of any rehearing of the order by the Court en banc; and

**(ii)** if the Government files a petition for review of an order under this section, until the Court of Review enters an order under subparagraph (C).

**(C) Implementation pending appeal**

Not later than 60 days after the filing of a petition for review of an order under paragraph (3)(B) directing the correction of a deficiency, the Court of Review shall determine, and enter a corresponding order regarding, whether all or any part of the correction order, as issued or modified, shall be implemented during the pendency of the review.

**(D) Certiorari to the Supreme Court**

The Government may file a petition for a writ of certiorari for review of a decision of the Court of Review issued under subparagraph (A). The record for such review shall be transmitted under seal to the Supreme Court of the United States, which shall have jurisdiction to review such decision.

**(5) Schedule**

**(A) Reauthorization of authorizations in effect**

If the Attorney General and the Director of National Intelligence seek to reauthorize or replace an authorization issued under subsection (a), the Attorney General and the Director of National Intelligence shall, to the extent practicable, submit to the Court the certification prepared in accordance with subsection (g) and the procedures adopted in accordance with subsections (d) and (e) at least 30 days prior to the expiration of such authorization.

**(B) Reauthorization of orders, authorizations, and directives**

If the Attorney General and the Director of National Intelligence seek to reauthorize or replace an authorization issued under subsection (a) by filing a certification pursuant to subparagraph (A), that authorization, and any directives issued thereunder and any order related thereto, shall remain in effect, notwithstanding the expiration provided for in subsection (a), until the Court issues an order with respect to such certification under paragraph (3) at which time the provisions of that paragraph and paragraph (4) shall apply with respect to such certification.

**(j) Judicial proceedings**

**(1) Expedited judicial proceedings**

Judicial proceedings under this section shall be conducted as expeditiously as possible.

**(2) Time limits**

A time limit for a judicial decision in this section shall apply unless the Court, the Court of Review, or any judge of either the Court or the Court of Review, by order for reasons stated, extends that time as necessary for good cause in a manner consistent with national security.

**(k) Maintenance and security of records and proceedings**

**(1) Standards**

The Foreign Intelligence Surveillance Court shall maintain a record of a proceeding under this section, including petitions, appeals, orders, and statements of reasons for a decision, under security measures adopted by the Chief Justice of the United States, in consultation with the Attorney General and the Director of National Intelligence.

**(2) Filing and review**

All petitions under this section shall be filed under seal. In any proceedings under this section, the Court shall, upon request of the Government, review ex parte and in camera any Government submission, or portions of a submission, which may include classified information.

**(3) Retention of records**

The Attorney General and the Director of National Intelligence shall retain a directive or an order issued under this section for a period of not less than 10 years from the date on which such directive or such order is issued.

**(l) Assessments and reviews**

**(1) Semiannual assessment**

Not less frequently than once every 6 months, the Attorney General and Director of National Intelligence shall assess compliance with the targeting and minimization procedures adopted in accordance with subsections (d) and (e) and the guidelines adopted in accordance with subsection (f) and shall submit each assessment to--

**(A)** the Foreign Intelligence Surveillance Court; and

**(B)** consistent with the Rules of the House of Representatives, the Standing Rules of the Senate, and Senate Resolution 400 of the 94th Congress or any successor Senate resolution--

**(i)** the congressional intelligence committees; and

**(ii)** the Committees on the Judiciary of the House of Representatives and the Senate.

**(2) Agency assessment**

The Inspector General of the Department of Justice and the Inspector General of each element of the intelligence community authorized to acquire foreign intelligence information under subsection (a), with respect to the department or element of such Inspector General--

**(A)** are authorized to review compliance with the targeting and minimization procedures adopted in accordance with subsections (d) and (e) and the guidelines adopted in accordance with subsection (f);

**(B)** with respect to acquisitions authorized under subsection (a), shall review the number of disseminated intelligence reports containing a reference to a United States-person identity and the number of United States-person identities subsequently disseminated by the element concerned in response to requests for identities that were not referred to by name or title in the original reporting;

**(C)** with respect to acquisitions authorized under subsection (a), shall review the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed; and

**(D)** shall provide each such review to--

**(i)** the Attorney General;

**(ii)** the Director of National Intelligence; and

**(iii)** consistent with the Rules of the House of Representatives, the Standing Rules of the Senate, and Senate Resolution 400 of the 94th Congress or any successor Senate resolution--

**(I)** the congressional intelligence committees; and

**(II)** the Committees on the Judiciary of the House of Representatives and the Senate.

**(3) Annual review**

**(A) Requirement to conduct**

The head of each element of the intelligence community conducting an acquisition authorized under subsection (a) shall conduct an annual review to determine whether there is reason to believe that foreign intelligence information has been or will be obtained from the acquisition. The annual review shall provide, with respect to acquisitions authorized under subsection (a)--

**(i)** an accounting of the number of disseminated intelligence reports containing a reference to a United States-person identity;

**(ii)** an accounting of the number of United States-person identities subsequently disseminated by that element in response to requests for identities that were not referred to by name or title in the original reporting;

**(iii)** the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed; and

**(iv)** a description of any procedures developed by the head of such element of the intelligence community and approved by the Director of National Intelligence to assess, in a manner consistent with national security, operational requirements and the privacy interests of United States persons, the extent to which the acquisitions authorized under subsection (a) acquire the communications of United States persons, and the results of any such assessment.

**(B) Use of review**

The head of each element of the intelligence community that conducts an annual review under subparagraph (A) shall use each such review to evaluate the adequacy of the minimization procedures utilized by such element and, as appropriate, the application of the minimization procedures to a particular acquisition authorized under subsection (a).

**(C) Provision of review**

The head of each element of the intelligence community that conducts an annual review under subparagraph (A) shall provide such review to--

**(i)** the Foreign Intelligence Surveillance Court;

**(ii)** the Attorney General;

**(iii)** the Director of National Intelligence; and

**(iv)** consistent with the Rules of the House of Representatives, the Standing Rules of the Senate, and Senate Resolution 400 of the 94th Congress or any successor Senate resolution--

    **(I)** the congressional intelligence committees; and

    **(II)** the Committees on the Judiciary of the House of Representatives and the Senate.

## CREDIT(S)

(Pub.L. 95-511, Title VII, § 702, as added Pub.L. 110-261, Title I, § 101(a)(2), July 10, 2008, 122 Stat. 2438; amended Pub.L. 114-23, Title III, § 301, June 2, 2015, 129 Stat. 278.)

## REPEAL OF SECTION

<Section repealed effective December 31, 2017, by Pub.L. 110-261, Title IV, § 403(b)(1), July 10, 2008, 122 Stat. 2474, as amended by Pub. L. 112-238, § 2(a)(1), Dec. 30, 2012, 126 Stat. 1631, except as provided in section 404 of Pub.L. 110-261, as amended, see Effective Date of Repeal note set out under this section.>

Notes of Decisions (6)

50 U.S.C.A. § 1881a, 50 USCA § 1881a
Current through P.L. 115-90. Also includes P.L. 115-92, 115-94, and 115-95. Title 26 current through 115-96.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.